**Robert CUNNINGHAM, Plaintiff,**

**v.**

**Daryl GATES, et al., Defendants.**

**Armand SOLY, et al., Plaintiffs,**

**v.**

**Daryl GATES, et al., Defendants.**

**Nos. CV96–2666 JSL, CV96–4157 JSL.**

United States District Court,
C.D. California.

Dec. 15, 1997.

Stephen Yagman, Yagman & Yagman, Venice, CA, Richard H. Millard, Los Angeles, CA, Joseph Reichman, Los Angeles, CA, Kathryn S. Bloomfield, Studio City, CA, Edward F. Figaredo, El Monte, CA, for Plaintiff.

Cory Brent, Deputy City Atty., Los Angeles, CA, Louis R. Miller, Christensen, White, Fink, Jacobs, Glaser, Weil, & Shapiro, LLP, Los Angeles, CA, Russell Sauer, Lathan & Watkins, Los Angeles, CA, for Defendants.

## ORDER RE MOTION OF DEFENDANTS SIS OFFICERS FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

LETTS, District Judge.

### INTRODUCTION

Before the court are motions for summary judgment in the above-referenced cases. The motions are based upon defendants'

claims that they are entitled to qualified immunity from trial. The motions are brought by police officers who are members of the Special Investigative Services ("SIS") unit of the Los Angeles Police Department ("LAPD"or "Department"). Similar motions have been brought by other groups of defendants are pending and will be addressed later in a separate opinion. Plaintiffs' individual cases arise out of a single incident, and have been consolidated for trial. In the interest of clarity, they will be referred to collectively herein as one case.

The incident that gave rise to this matter occurred on June 26, 1995, in Newbury Park, California, when plaintiff Robert Cunningham and his accomplice, decedent Daniel Soly, became engaged in a gun battle with SIS officers. After the shootings, Soly was dead and Cunningham was wounded. Two SIS officers also were wounded.

Plaintiffs allege that the relevant events began long before the night of the shooting. They allege that they were victims of a repeating course of unlawful conduct developed and engaged in by members of the SIS. Plaintiffs allege that all of the members of the SIS are knowing participants in this course of conduct, and that each aids and abets the conduct of all of the others. Plaintiffs further allege that this unlawful course of conduct is knowingly condoned and encouraged by the other named defendants, all of whom are in a position to prevent it.

For plaintiffs to prevail against any defendant, they will have to persuade the jury that at least five SIS officers have knowingly lied regarding the events surrounding the shooting of Cunningham, Soly and the two officers. The plaintiffs' only percipient witness will be the plaintiff Robert Cunningham, a convicted felon and admitted robber. In an ordinary case, this would almost certainly be an insurmountable task.[1]

To meet their burden, plaintiffs will attempt to prove that these and other SIS officers have lied to juries in the past in order to cover up their misdeeds, and that certain policies, for which all of the non-SIS officer defendants are responsible, have encouraged the officers to tell these lies in this and other cases.

## NATURE OF THE CASE

Plaintiffs allege that the relevant events of June 26, 1995 began when SIS officers engaged in their standard operating procedure, as follows. The SIS officers placed Cunningham and Soly under surveillance at approximately 3:00 p.m. A twenty-one man unit, with approximately eighteen men in the field, approximately eight police cars, and a helicopter were involved in the surveillance. Several hours later, the SIS officers followed plaintiff Cunningham and Soly to what they believed would be the scene of a robbery—the Southwest Liquor and Deli in Newbury Park, California. Third Amended Complaint at 8. The officers permitted Cunningham and Soly to rob the store, although they had both the probable cause and the ability to arrest Cunningham and Soly before the robbery was committed. *Id.* The officers permitted Cunningham and Soly to re-enter their automobile. *Id.* at 9. The officers used their police cars to "jam" Cunningham and Soly's car into a confined space. *Id.* They then, without announcing themselves as police, opened fire with approximately eighteen shotgun blasts and shots from handguns, which resulted in Soly's death and Cunningham's permanently disabling injuries. *Id.*

In order to make their case, plaintiffs will allege that this incident (*"Cunningham"*) was part of a common course of unlawful conduct and that certain elements of the *Cunningham* incident have occurred repeatedly. *See id.* The complaints reveal that the plaintiffs intend to rely on at least three other specific incidents for the purpose of establishing the alleged common course of

---

**1.** In a criminal case in which he was tried and convicted for attempted murder of a police officer and the murder of Daniel Soly, Cunningham already has attempted unsuccessfully to persuade a jury that the officers initiated the gun battle that gave rise to this case. The court has consid-

ered whether, after his criminal convictions, Cunningham remains free to bring this lawsuit in light of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). The court's conclusion that he does has been explained in a separate order.

unlawful conduct:[2] *"Smith,"*[3] *"Gomez"*[4] and *"Berry,"*[5] each of which shares common features with *Cunningham.* These incidents are referred to collectively as the "alleged common course incidents."

Plaintiffs allege that evidence of the officers' conduct in the alleged common course incidents, taken together with other evidence, will establish a continuing course of conduct which has the following common elements:[6]

1. SIS officers commence surveillance of one or more identified persons suspected of having committed prior armed robberies characterized by a particular *modus operandi.*

2. On a night when a new robbery is expected to occur, they commence surveillance at or around the time the suspects enter their car on the way to the robbery.

3. They follow the suspects to the scene of the expected robbery.

4. They ignore probable cause to arrest, and allow the robbery to occur without any effort to prevent it.

5. After the robbery is complete, they corner the suspects in a confined space at or inside the suspects' car.

6. Whether or not the suspects offer any actual or legitimately perceivable threat, the officers commence shooting at the suspects, and do not finally stop shooting until all but one of the suspects is dead.[7]

7. They cover up the truth of the relevant events by fabricating evidence that officers shot only persons who posed an immediate threat to themselves or others, and by corroborating the existence of such threats through falsification of police reports and providing perjurious testimony at both criminal and civil rights trials.

It appears that much of what plaintiffs offer as evidence of this continuing course of conduct will not be in dispute, based upon the information before the court:[8]

1. The officers will not dispute that in each robbery incident the SIS surveillance commenced with one or more identified suspects, and a known *modus operandi.*

2. They will not dispute that in each robbery incident the surveillance commenced not later than when the suspects entered

---

2. Defendants attempts to portray each of the incidents as isolated instances by including them in statistics covering all of the SIS surveillance operations have not been persuasive. There is no reason to believe that any substantial number of the surveillances included in these statistics have any substantial similarity to cases involving robbers "caught in the act." Similarly, defendants attempts to show that the "jam" technique used for cornering suspects in their cars is routinely used, with very rare need for the use of force, have not been persuasive. Defendants have offered nothing but their own bare word to support this claim. They offer no information concerning how many of those jammed were "caught in the act" of a crime. The court presumes that relatively few of the successful jams fit this description. Otherwise the question would arise why the crimes were occurring so frequently, if it the police were not intentionally allowing the crimes to occur.

3. The *"Smith"* incident has resulted in three lawsuits, *Grover Smith, et al. v. Daryl Gates, et al.,* Case No. CV 97–1286 JSL, *D. Lyons, et al., v. Daryl Gates, et al.,* Case No. CV 97–1836 JSL, *G. Nicoletti, et al. v. Daryl Gates, et al.,* Case No. CV 97–2377 JSL. Given that there have been no previous court proceedings in *Smith,* the court has limited information about that incident.

4. The *Gomez* incident resulted in the lawsuit *Julia Gomez, et al. v. Daryl Gates, et al.,* Case No. CV 90–856 JSL.

5. The *Berry* incident resulted in the lawsuit *Jane Berry v. Daryl Gates, et al.,* Case No. CV 89–7381 SVW.

6. The plaintiffs' allegations regarding the common course of conduct are found in the Third Amended Complaint and plaintiffs' papers filed in opposition to this motion. They are reiterated in the three complaints arising out of the *Smith* incident.

7. In *Smith,* according to plaintiffs, the suspect who would have remained alive, in fact, was a person who was not involved in the robbery at all, and was shot in the mistaken belief that he was one of the suspects.

8. The court concludes that these elements will not be disputed by the officers based upon a comparison of the declarations of the officers and upon the court's review of the testimony previously given by these officers in connection with the common course incidents. See *infra* page 1261.

their car on the way to the robbery. They will not dispute that before each of the robberies occurred, between 13 and 22 officers, utilizing between 7 and 13 police cars and a helicopter, were directly involved in the surveillance.

3. The officers will not dispute that in each robbery incident officers followed the suspects to the scene of the robbery. They will not dispute that the suspects parked their car some distance away from the scene of the robbery and were observed for periods ranging from approximately 4.5 to 7 hours before the robbery occurred.

4. The officers will not dispute that in each robbery incident the robbery occurred while all of the SIS officers were deployed as instructed.

5. They will not dispute that after each robbery, SIS officers cornered the suspects inside or near their cars. There will be no dispute that there were no independent eyewitnesses to any of the shots fired.

6. The officers will not dispute that in each robbery incident, after the shooting ceased, only one suspect remained alive, and that suspect was seriously wounded.[9]

The officers will dispute facts alleged by plaintiffs that relate to what was going on in the officers' minds—what they saw, and what they thought. As to each robbery incident, the officers will assert that they did not believe that they had probable cause to arrest until immediately before the robbery occurred. They will also assert that they did not realize that the robbery was about to occur until it was too late to prevent it. And they will assert that they did not shoot anyone whom they did not believe in good faith to be posing an imminent threat to themselves or someone else at the time they shot.

The officers' explanations of why they did not think that they had probable cause to arrest before the robberies occurred, why the robberies could not be prevented, and why it was necessary to shoot everyone who

was shot will be examined and compared as among all of the alleged common course incidents. Plaintiffs will attempt to demonstrate that the things claimed to have been unintended have happened too often to be attributable to accident or mistake, and that perceived threats that could not have been real occur too often, for the officers' explanations of what happened and why to be credible.[10]

## QUALIFIED IMMUNITY STANDARD

■ "Government officials who perform discretionary functions are protected from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lum v. Jensen,* 876 F.2d 1385, 1386 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

> The threshold determination of whether the law is clearly established is a question of law for the court. [Citations.] The second part of the test, whether a reasonable state official could have believed the action taken was lawful, is a mixed question of law and fact. It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took. If there are genuine issues of material fact in issue relating to the historical facts of what the official knew of what he did, it is clear that these are questions of fact for the jury to determine.

*Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1099 (9th Cir.1995).

■ Under *Sinaloa,* the question of whether a "reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took," is a question for the jury, unless on the basis of undisputed facts, the court can conclude, as a matter of law, that a reasonable official with

---

9. *See supra* note 7.

10. Among the four incidents the officers shot a total of five persons on the basis of perceived threats that could not have been real, because the suspects were unarmed. Four suspects were shot and killed at extremely short range after an initial barrage of fire had ceased, and the shooting officer had been able to approach without further shooting. Three of the suspects shot and killed at close range were unarmed.

the knowledge possessed by the SIS officer defendants would have known that his conduct was unlawful.

For the reasons set forth herein, the court finds that the rights allegedly violated by the defendants, as set forth by the plaintiffs, were clearly established at the time that the violations allegedly occurred. Furthermore, there are genuine issues of material fact relating to what the SIS officer defendants knew of what they did. Thus, the question of whether the defendants believed their conduct was lawful in light of what they knew and the actions they took is a question of fact for the jury to determine. Accordingly, the SIS officers' motion for summary judgment based on qualified immunity must be DENIED.[11]

## ANALYSIS

In *Berry*, *Gomez* and *Cunningham*, the officers' explanations of these matters have been recorded not just in various police documents relating to the incidents, but also in the transcripts of the trials that arose out of the incidents, and, with regard to *Gomez*, in the transcripts of grand jury proceedings. The testimony of experts and other witnesses has also been recorded. The court presumes that the officers' versions of what happened in the *Smith* incident have been recorded at least in police reports.

In order to rule on pending motions, and in anticipation of the need for future rulings, the court has read and compared the officers' testimony and other relevant portions of the above-referenced transcripts. It is unnecessary and undesirable to cite any particulars of what these transcripts show. It is also unnecessary to consider them in order to determine whether the SIS officers who shot Cunningham and plaintiffs' decedent Soly, are entitled to qualified immunity. The version given by Cunningham of the events that transpired, if believed by a jury, would constitute a violation of clear law by the shooting officers. On this basis alone, those defendants would not be entitled to qualified immunity. *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d at 1099.[12]

▮ Plaintiffs' claim that the remaining SIS officers are liable rests on different grounds. The court does not regard the law to be settled that, by falsifying police reports and giving perjured corroborating testimony regarding the use of excessive force by others, officers become liable for the use of force itself. The court also does not consider it to be settled law that such acts can make the officer liable to the plaintiffs for denial of the right to a fair trial, or for other deprivation of due process, until the trial is over, and the plaintiff has not prevailed.[13]

▮ It is settled law, however, that if a group of officers agree that if and when some of them knowingly commit unlawful acts others will falsify records and testify falsely to cover up the truth of the relevant events, all of those involved are liable for the unlawful acts. An official is liable in his individual capacity if he "set[] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991). The officer can be held liable even if his "acts" consist of mere acquiescence to the unconstitutional acts or culpable conduct with respect to the "training, supervision, or control of his subordinates."

11. Although qualified immunity goes to immunity from trial, in this case the granting or denial of these motions would have no impact on the evidence and arguments presented at trial. Regardless of whether these motions are granted or denied, the plaintiffs' case will go forward, the same witnesses will testify and essentially the same issues will be presented. The only question is whether the officers would be nominal defendants and whether damages could be assessed on them at that trial. Accordingly, the only possible effect of future reversal of this ruling would be the vacation of any damage awards against the individual defendants.

12. The defendants who shot Cunningham and Soly are not among the moving parties here. Of the officers who were actually present during the shooting, only defendant Brian Davis, who apparently shot defendant Lawrence Winston but did not actually shoot Cunningham or Soly, has filed a motion for summary judgment based on qualified immunity.

13. Because Cunningham was convicted of murder and attempted murder, he cannot raise any claims that he was denied the right to a fair trial by the same acts that are at issue in this case. *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

*Id.* Proof of plaintiffs' allegations that the SIS officers engage in a continuing course of unconstitutional conduct whereby some commit excessive force with complete impunity and others assist by covering up those unconstitutional acts would constitute proof of violation of clearly established law.

The court now must turn to the question of whether a reasonable juror could find that the SIS officers in fact have engaged in a course of conduct which includes the giving of false testimony. To undertake this analysis, it is necessary to go beyond the declarations submitted by the parties and consider how the officers may be impeached with testimony given on prior occasions and whether an inference might then be drawn that the alleged course of conduct might include the element of planned fabrication of documents and testimony. The court concludes that a reasonable juror considering the totality of the evidence, and resolving factual disputes in favor of the plaintiffs, could conclude that such a course of conduct exists, and that a reasonable person in the position of the SIS officer defendants would have known that his conduct was unconstitutional.[14]

#### CONCLUSION

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED that the motion for summary judgment of defendants SIS officers be DENIED.

IT IS SO ORDERED.

---

[14]. The court has noted that the credibility of the officers' versions of why the robberies were not prevented, and why threats that were not actual were perceived, suffers when all of the various robbery incidents are compared. The court has also noted that there may be credibility problems with the testimony concerning robbers who were shot at close range. The court refrains at this time from giving additional particulars of how the officers might be impeached. To do so effectively, the court would have to undertake a detailed comparison of the officers' testimony in connection with all of the common course inci-

dents. This would require a tremendous outlay of judicial resources, which would go far to doing the plaintiffs' job for them. It would be almost certain to have some effect of "coaching" plaintiffs concerning things that might not otherwise occur to them. It would also be likely to have the effect of "coaching" the defendants to anticipate attacks that the plaintiff might otherwise be hoping to use by surprise. (This is a special consideration when the issue to be considered is whether or not there has been a planned course of coverup.)