**PACIFIC HARBOR CAPITAL, INC., Plaintiff–Appellee,**

v.

**CARNIVAL AIR LINES, INC., Defendant,**

and

**Jeffrey M. Herman; Stuart S. Mermelstein, Movants– Appellants.**

No. 98–35633.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 16, 1999.[1]

Filed April 27, 2000.

---

1. Pursuant to Appellant's motion, the panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

Paul T. Fortino, Perkins Coie, Portland, Oregon, for plaintiff-appellee Pacific Harbor Capital, Inc.

Jeffery M. Herman, Stuart S. Mermelstein, Miami, Florida, for the appellants.

Before: KLEINFELD and W. FLETCHER, Circuit Judges, and MANELLA,[2] District Judge.

Opinion by Judge MANELLA; Partial Concurrence and Partial Dissent by Judge KLEINFELD.

**2.** The Honorable Nora Manella, District Judge for the Central District of California, sitting by designation.

MANELLA, District Judge:

Appellants Jeffrey M. Herman and Stuart S. Mermelstein are attorneys with the law firm of Herman Grubman & Moore in Miami, Florida. They appeal the district court's order ("Order dated June 3, 1998"), barring both attorneys from appearing *pro hac vice* before Malcolm F. Marsh, District Judge for the District of Oregon, and requiring any member of their law firm to attach copies of Judge Marsh's sanction order when petitioning for *pro hac vice* admission. We have jurisdiction of this appeal of a post-judgment order under 28 U.S.C. § 1291, and we affirm in part and vacate in part.

I

*FACTUAL AND PROCEDURAL
BACKGROUND*

Appellee Pacific Harbor Capital, Inc. ("Pacific Harbor") leased an airplane and related equipment to defendant Carnival Airlines, Inc. ("Carnival"). Carnival fell behind on its payments, and on June 17, 1997 Pacific Harbor brought suit in the District of Oregon for breach of the lease and recovery of the airplane.

A few weeks later, on July 3, 1997, Carnival, through its attorneys, appellants Herman and Mermelstein, filed for and obtained a temporary restraining order ("TRO") from a Florida state court judge prohibiting Pacific Harbor from asserting any possessory rights or interest in the airplane. Herman and Mermelstein sought the Florida TRO *ex parte*, without attempting to notify Pacific Harbor. The two attorneys also failed to inform the Florida state court judge that the Oregon action was pending, that their client, Carnival, was behind in its lease payments, or

that the lease had a forum selection clause designating Oregon as the venue for any dispute.

Once Pacific Harbor learned of the Florida TRO, it removed the case to federal court. On July 10, the Florida district court dissolved the TRO and transferred the case to the District of Oregon.

On Friday, July 11, Pacific Harbor moved for its own TRO to preclude Carnival from continuing to fly the plane. Judge Marsh, district judge for the District of Oregon, heard the matter that afternoon. Carnival was represented by local counsel, Keith Ketterling, and Herman, who appeared telephonically. Following argument, the district court granted the TRO as to the airplane, two engines, and all logs, manuals, certificates, and technical data pertaining to the airplane and the engines. The TRO prohibited Carnival from using Pacific Harbor's airplane, engines, and parts and further required Carnival to assemble the airplane promptly at one of Carnival's primary maintenance facilities in Fort Lauderdale, Florida. The court required Pacific Harbor to post a bond of $250,000 as a condition of the TRO. Pacific Harbor's attorney had a bond for $2,000,000 that he posted immediately and was given permission to replace it the following Monday with a bond for $250,000.

During the hearing on the application for the TRO, Judge Marsh stated on four separate occasions that the TRO was granted and was effective as of that date. The four statements made by Judge Marsh included: 1) "I am going to enter the TRO,"; 2) "[a]t this time I am going to sign this TRO,"; 3) "the TRO is in effect,"; and 4) "I will direct that [the] TRO is now in [e]ffect." [3]

**3.** During the July 16 hearing, Judge Marsh reviewed the draft transcript from the July 11 TRO hearing with the parties and made corrections, including replacing the word "expect" with "direct." The corrected sentence read, "I will direct that [the] TRO is now in [e]ffect." This statement was followed by the statement, "And the bond will be replaced

Monday morning." Judge Marsh recalled what he had said at the prior hearing and corrected typing errors in the transcript only five days later. Given the context and the use of the present verb tense, only the corrected sentence made sense. Defendant's attorney had just asked permission to post the bond

The order granting the TRO was dated Friday, July 11, 1997 and stated that it was effective upon service by facsimile on defendant's counsel in Miami, Florida. At no time during the hearing did Herman express confusion over, or seek clarification of, the effective date of the TRO.

Despite the court order, Carnival continued to use the plane and engine for commercial purposes throughout the weekend following issuance of the TRO. On Monday, July 14, plaintiff filed a motion for contempt, citing Carnival's continued use of the plane on Saturday, Sunday, and Monday and the continuing failure to return the engines and documentation as ordered.[4] On Wednesday, July 16, the district court conducted a hearing on plaintiff's contempt motion. Messrs. Herman and Mermelstein appeared telephonically. At the hearing, Herman advised the court that he had misunderstood when the TRO was to go into effect and was under the impression that the TRO would not be effective until Monday, July 14.[5] When questioned by Judge Marsh, Carnival's local counsel, Ketterling, acknowledged that he had understood the TRO to be effective as of the date of the motion hearing, Fri-

day, July 11. The judge made clear he did not believe Herman's explanation.[6]

As of Wednesday, July 16, Carnival still had not complied with the terms of the TRO. The two engines and the documentation pertaining to the aircraft had not been delivered to Fort Lauderdale. However, Herman assured the court that he was trying to get the engines to Fort Lauderdale and stated "[w]e can do the exchange [of the engines] on Friday." The court found Carnival in contempt of the court's TRO as to the airplane and scheduled a show cause hearing for Friday, July 18, concerning the engines and airplane documentation. Pacific Harbor's attorney requested that "the Court make it perfectly clear in its order that the engines are not to be used for any purpose." The court did so. The court also ordered the Florida attorneys to appear personally for the Friday hearing, along with Carnival's CEO or the person directly responsible for compliance with the TRO.

Herman did not appear at the Friday, July 18 show cause hearing, but Mermelstein did. Tom Fay, chief pilot for Carnival and manager of its A300 fleet, was also

and to replace it with a bond for a lesser amount on the following Monday. Because both defendant's attorney and Judge Marsh discussed replacing the bond on Monday, the logical conclusion was that the Judge had *directed* the TRO to be in effect immediately, not that he expected it to be in effect at some later date. This is the only language consistent with Judge Marsh's other statements.

4. On Monday, July 14, Carnival did *not* fly the plane directly to Fort Lauderdale; rather Carnival flew the plane from Los Angeles to Newark, New Jersey as a Pan Am flight, with revenue passengers, and then returned to Fort Lauderdale.

5. Although the July 11 transcript shows that Judge Marsh specifically noted that the $2,000,000 bond would be replaced on Monday with the required $250,000 bond, and that the TRO was in effect as of Friday, Mr. Herman, according to his affidavit, advised his client to the contrary:

The Carnival representative told me that flights had already been scheduled requiring the use of this aircraft during the week-

end. I explained that Pacific Harbor's counsel stated that the bond would not be placed until Monday and the order stated that the temporary restraining order would take effect upon the posting of the bond. Accordingly, I explained that it probably would not technically be a violation of the temporary restraining order to fly the aircraft during the weekend, but there were certain risks inherent in doing so.

Pacific Harbor's attorney made no representation "that the bond would not be posted until Monday." To the contrary, plaintiff's counsel made clear his readiness to post the $2,000,000 bond that Friday, and the court granted him permission to do so and replace it with the $250,000 bond Monday. If, as Herman asserted, the bond were not to be placed until Monday, the TRO would not have been in effect, and his client's use of the plane over the weekend would have been perfectly legal and not in the least "risky."

6. As the court put it: "All right. Now Mr. Herman.... We are having a little credibility problem here."

present. A week after the TRO had been granted and despite Herman's previous assurances to the court, Carnival still had not complied with the TRO. Neither the two engines nor the airplane documentation had been returned to Pacific Harbor. At the Friday hearing, Mermelstein argued that it was "an impossibility" for Carnival to comply with the terms of the TRO, and that a third company, Babcock & Brown, was conspiring with Pacific Harbor to "thwart" Carnival's efforts to comply with the TRO.[7]

■ Carnival's chief pilot, Mr. Fay, confirmed that the two airplanes to which Pacific Harbor's engines were attached had been in use since the Wednesday contempt hearing to fly revenue passengers from New York to Los Angeles, San Juan and the Bahamas. Judge Marsh thereupon questioned Mermelstein's credibility, held both Mermelstein and Carnival Air in contempt, and disqualified Mermelstein from appearing in his court. Judge Marsh orally advised Mermelstein that based on his conduct, the judge would enter an order permanently banning Mermelstein and his firm from *pro hac vice* admission to the District of Oregon. In addition, the court warned Mermelstein and Fay that they were not to leave the District of Oregon until the TRO was fully complied with, and that they would be arrested on civil contempt charges if the engines and documentation were not produced for Pacific Harbor's inspection by Saturday morning, July 19, 1997.[8]

On July 22, the district court issued a written order memorializing and narrowing the sanctions. Relying on Local Rule 110–2(b) and the court's inherent power, Judge Marsh barred members of appellants' firm from appearing *pro hac vice* in his court, and required appellants and other members of their firm to attach a copy of the sanctions order to any future *pro hac vice* application submitted in the District of Oregon. In explaining the order, Judge Marsh noted that he found defense counsel Herman's representation concerning his understanding of the effective date of the TRO to have been made in bad faith. (The judge had made clear at the July 16 hearing that he found Herman's explanation incredible.) The court further found that Herman and Mermelstein had effectively sanctioned their client's violation of his court order. (Herman admitted having advised Carnival it could continue to fly the planes over the weekend; Mermelstein claimed Carnival's compliance with the court order had been an "impossibility"—a representation later shown to be untrue.) Finally, the court found Herman and Mermelstein's failure to advise the Dade County court of the pending federal case in Oregon and to advise the Florida court of their client's default on lease payments to have been in bad faith. The court concluded that defense counsel's "frivolous arguments and misrepresentations" were more than mere technical violations—they had interfered with the court's ability to maintain effective control over court processes.

The underlying case was dismissed without prejudice April 13, 1998, after Carnival filed for Chapter 11 protection. On April 17, appellants filed a motion for reconsid-

---

7. Carnival was also in default on lease payments to Babcock & Brown, which owned the two planes to which Pacific Harbor's engines were attached. Mermelstein's "impossibility" argument amounted to a claim that had Carnival flown the planes to Ft. Lauderdale, as ordered by the court, they might have been seized by Babcock & Brown before the engines could be removed. Mermelstein offered no evidence that Carnival had been "thwarted" in its attempts to comply with the TRO. The uncontradicted evidence was that Carnival had made no attempt to comply.

8. The court's statement that Mermelstein could "stay out of custody" only on condition that he advise the Marshal of his whereabouts over the weekend, and his threat to jail Mermelstein should his client not comply with the court order, appear to have exceeded the court's power. Although it is unclear whether the court would have made good on its threat to jail counsel had his client not complied, conditioning a lawyer's freedom on his client's compliance with a court order is improper. Accordingly, we vacate that portion of the court's order.

eration of the sanctions order and supported their motion with argument, affidavits, and other exhibits. In an affidavit supporting the motion, Herman for the first time stated that there had been a poor telephone connection during the Friday telephonic TRO hearing, and claimed that during the hearing he had informed the court that he was having difficulty hearing some of the proceedings.[9]

On June 3, 1998, after considering these arguments, the court adopted a modified sanction order that barred only Herman and Mermelstein from appearing before him. The order further required other members of appellants' firm to attach copies of the July 1997 and the June 1998 orders to any application for *pro hac vice* admission before him.[10] Judge Marsh based the sanction on appellants' failure to notify the Florida state court of the pending action in Oregon district court, Herman's advice to his client in contravention of the TRO, and Mermelstein's bad faith arguments alleging that compliance with the TRO was impossible. Given the judge's statement at the Friday hearing that the TRO was "in effect" and Herman's failure to seek clarification either from the judge at the hearing or from his

local counsel, Judge Marsh found Herman's claim that he understood the TRO would not go into effect until the following Monday to be incredible. This appeal follows.

## II

### STANDARD OF REVIEW

■■ The district court's entry of sanctions is reviewed for an abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *In re Keegan Management Co.*, 78 F.3d 431, 436 (9th Cir.1996). We will reverse a district court's factual findings as to whether an attorney acted recklessly or in bad faith only if they are clearly erroneous. *Kanarek v. Hatch*, 827 F.2d 1389, 1391 (9th Cir.1987).

## III

### DISCUSSION

■ The district court issued sanctions pursuant to its inherent powers, 28 U.S.C. § 1927. Section 1927 authorizes the imposition of sanctions against any lawyer who wrongfully proliferates litigation proceedings once a case has commenced. *See*

---

9. No statement from Mr. Herman informing the court that he was having difficulty hearing appears in the transcript from the July 11 TRO hearing.

10. Both appellants and appellees assume, without discussion, that the court order barred appellants and members of their firm from appearing in any district court in Oregon. While the transcript of the hearing supports such an interpretation, the wording of the June 1997 order and the July 1998 order following appellants' motion for reconsideration does not. The original June 22, 1997 order reads as follows:

> [A]ttorneys Jeffrey Herman and Stuart Mermelstein and their law firm Herman & Grubman are permanently and prospectively barred from appearing before this court *pro hac vice*. Further, said defense counsel must attach a copy of this order to any future *pro hac vice* applications submitted in the District of Oregon.

If the first sentence is read to bar appellants and members of their firm from appearing in any district court in Oregon, the second sen-

tence becomes nonsensical. No attorney "permanently and prospectively barred from appearing" in the District of Oregon would have occasion to submit "any future *pro hac vice* applications" in that district.

The July 1998 order does not compel a different interpretation. After finding his earlier order overbroad, Judge Marsh concluded:

> Thus, my prior order is modified to bar only Jeffrey Herman and Stuart Mermelstein from appearing before this court *pro hac vice*. Other members of the firm may petition for *pro hac vice* admission, but must attach copies of this and my July, 1997 order to any such application.

We interpret the term "this court" to refer to Judge Marsh's court, and the judge's order to bar appellants Herman and Mermelstein from applying for *pro hac vice* admission in cases before him, and requiring members of their firm who do so to submit copies of the court order to bring to the court's attention their membership in appellants' law firm.

*Cunningham v. County of Los Angeles,* 879 F.2d 481, 490 (9th Cir.1988).

 The imposition of sanctions under § 1927 requires a finding of bad faith. *In re Keegan Management Co., Securities Litig.,* 78 F.3d 431, 436 (9th Cir.1996). "We assess an attorney's bad faith under a subjective standard. Knowing or reckless conduct meets this standard." *MGIC Indem. Corp. v. Moore,* 952 F.2d 1120, 1121–22 (9th Cir.1991) (reversal of sanctions required where district court's "observations were as consistent with negligence as with bad faith"); *see also Estate of Blas v. Winkler,* 792 F.2d 858, 861 (9th Cir.1986) (observing that a finding of bad faith is crucial, because a frivolous argument by itself is insufficient to support an award of sanctions under § 1927). However, "[a] district court's failure to make express findings [of bad faith] does not require a remand if 'a complete understanding of the issues may be had [from the record] without the aid of separate findings.'" *Optyl Eyewear Fashion International Corp. v. Style Companies,* 760 F.2d 1045, 1051 (9th Cir.1985) (quoting *Swanson v. Levy,* 509 F.2d 859, 861 (9th Cir.1975)); *see also Baldwin Hardware Corp. v. Franksu Enter. Corp.,* 78 F.3d 550 (Fed.Cir.1996) (affirming § 1927 disciplinary and monetary sanctions, issued *sua sponte,* barring attorney from *pro hac vice* admission before court and requiring attorney to attach sanction order to any application for *pro hac vice* admission in the district; although court did not use words "bad faith" in imposing sanctions, record supported finding that court deemed firm's actions underlying sanctions to be at least reckless).

 In addition, "an attorney subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard." *Weissman v. Quail Lodge*

*Inc.,* 179 F.3d 1194, 1198 (9th Cir.1999). However, an opportunity to be heard does not require an oral or evidentiary hearing on the issue. *See Baldwin Hardware,* 78 F.3d at 562 (finding no due process violation for sanctions issued *sua sponte* after seven-week trial, where attorney had notice of court's displeasure and opportunity to respond during trial and after court proposed sanctions; no separate hearing on sanctions required). The opportunity to brief the issue fully satisfies due process requirements. *Resolution Trust Corp. v. Dabney,* 73 F.3d 262, 268 (10th Cir.1995); *see also Toombs v. Leone,* 777 F.2d 465, 472 (9th Cir.1985) ("Due process ... requires that parties subject to sanctions have 'sufficient opportunity to demonstrate that their conduct was not undertaken recklessly or willfully.'").[11]

Here, the district court made explicit findings of bad faith based on: 1) counsels' failure to inform a Florida state court of the pending, previously filed federal action; 2) Herman's advising his client that it could continue to fly the plane after entry of the TRO; and 3) Mermelstein's bad faith arguments made during the second contempt hearing. Judge Marsh held that these misrepresentations and bad faith arguments violated the rules of conduct and interfered with his ability to maintain effective control over court processes. Although appellants argue to the contrary, we find neither clear error nor abuse of discretion in Judge Marsh's assessment of counsels' conduct.

### 1. *Herman*

 As to Herman, the district court found that his justifications for advising his client that the TRO would not be in effect until Monday, July 14—first asserting that he did not understand the court's repeated declarations that the TRO was in effect immediately, and later claiming a poor

---

11. "The usual method for resolving factual issues under § 1927 is by affidavit, *North American Foreign Trading Corp. v. Zale Corp.,* 83 F.R.D. 293, 298 (S.D.N.Y.1979). That would appear to be a perfectly adequate mechanism in many instances for providing

counsel with an opportunity to be heard where the judge has effectively witnessed the offenses." Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse,* p. 416–417 (2d ed.1994).

phone connection—lacked credibility. We cannot disagree. The record shows that the court instructed the parties on four separate occasions during the Friday hearing that the TRO was in effect immediately. As Judge Marsh noted, Herman failed to explain why he ignored the judge's repeated statements that the TRO was in effect, or why he failed to seek clarification from either the judge or his local counsel, who clearly understood the TRO to be in effect Friday. Even assuming Herman had had difficulty hearing the proceedings, his failure to seek clarification on such a critical issue was, as the court observed, "highly reckless at best." *Cf. MGIC Indem. Corp.*, 952 F.2d at 1122 (knowing or reckless conduct meets § 1927 standard for bad faith).

Having conducted a hearing concerning the TRO and two subsequent contempt proceedings, Judge Marsh had ample opportunity to evaluate the legitimacy of counsels' justifications for their client's continued non-compliance with the court's order and Herman's claims of good faith. We defer to Judge Marsh's findings of fact and assessments of counsels' credibility. *See Primus Automotive Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997) ("The district court has 'broad fact-finding powers' with respect to sanctions, and its findings warrant 'great deference'.") (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1366 (9th Cir.1990)). Accordingly, we find Judge Marsh did not clearly err in finding Herman lacked credibility or abuse his discretion in finding his conduct warranted sanctions.[12]

### 2. *Mermelstein*

As to Mermelstein, the court found that his arguments that compliance with the TRO was impossible and that a third party had conspired with Pacific Harbor to thwart Carnival's efforts to comply with the TRO were made in bad faith. Mermelstein made these arguments during the July 18 hearing, a week after the TRO went into effect and two days after he, personally, had assured the court that the engines would be returned to Fort Lauderdale immediately.

Moreover, the court found that Mermelstein had breached his duty of candor to the court, and had unreasonably multiplied the proceedings in this matter. As this court has observed, "an attorney does not simply act as an advocate for his client; he is also an officer of the court. As such, an attorney has a duty of good faith and candor in dealing with the judiciary." *United States v. Associated Convalescent Enters. Inc.*, 766 F.2d 1342, 1346 (9th Cir.1985) (affirming § 1927 sanctions). Mermelstein had an opportunity during the July 16 hearing to disclose to the court any alleged barriers to compliance that his client faced. He raised no such concerns, instead assuring the court that his client would belatedly comply with the court's order. Thus, Mermelstein further delayed compliance with the court's order and wasted judicial resources. *See Wages v. Internal Revenue Serv.*, 915 F.2d 1230 (9th Cir.1990) (affirming award of § 1927 sanctions against pro se litigant based on finding of bad faith in multiplying proceedings).

Moreover, Judge Marsh found Mermelstein's argument that his client's compliance with the TRO had been "impossible" to be unsupported by the facts and insufficient to explain Carnival's continued use of the engines for commercial flights. In short, Judge Marsh concluded that Mermelstein had made misrepresentations to the court in bad faith.[13]

**12.** The principal fact issue in § 1927 cases—the state of mind of the offender—may perhaps best be described as a mixed question of law and fact. It is one which "is informed by the district court's intimate familiarity with the case, parties, and counsel, a familiarity [that an appellate court] cannot have. Such a determination deserves substantial deference from a reviewing court." *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir. 1987).

**13.** We do not find Judge Marsh's sanctions to have been based on Mermelstein's client's non-compliance, but on Mermelstein's misrepresentations to the court, made in an effort

We defer to Judge Marsh's findings of fact and assessments of counsels' credibility. It is undisputed that the facts did not support Mermelstein's claim that Carnival's compliance with the court order was "an impossibility." Nor did they support his claim that Carnival had been "thwarted" in its attempt to comply. On the facts before him, Judge Marsh was entitled to conclude that Mermelstein's claims were baseless and constituted misrepresentations made in bad faith, which interfered with the court's ability to enforce its orders.

3. *Due Process*

■ Appellants also allege that they were denied procedural due process, *viz.*, notice and an opportunity to be heard. Here, as in *Baldwin, supra*, the court issued sanctions *sua sponte*, several days after the second contempt hearing at which Judge Marsh expressed his displeasure with Mermelstein's conduct and indicated that he intended to issue an order prospectively barring Mermelstein and members of his firm from appearing *pro hac vice* in the district. Although appellants were given notice of sanctions, they were not allowed, at that time, to offer explanations for their conduct. However, appellants subsequently filed a motion for reconsideration of the sanctions and supported their motion with argument; affidavits, and other exhibits. Judge Marsh considered appellants' arguments and modified his original order accordingly.[14] Thus, appellants were given the opportunity to fully brief the issue, to respond to the court's findings, and to demonstrate that their conduct was not undertaken in bad faith. Where, as here, the judge witnessed appellants' sanctionable conduct, discussed appellants' justifications for violating a court order during two contempt proceedings, and considered their written explanations for misconduct, a separate hearing was not required. We reject appellants' due process challenge to the order for sanctions.

## IV

### CONCLUSION

For the reasons set forth above, we find no abuse of discretion and affirm the district court's imposition of sanctions against appellants.

AFFIRMED in part AND VACATED in part.

KLEINFELD, Circuit Judge, concurring and dissenting:

The district judge was properly and understandably frustrated that Carnival held onto the engines they had not paid for and continued to fly the planes in violation of the court's order. But I do not think the record justifies the harsh sanctions imposed on Carnival's lawyers. Their client did wrong, but all they did was defend their client, hopelessly because of their client's misconduct, but not so abusively as to justify the sanctions imposed on them. Lawyers from time to time get saddled with a client whose litigation conduct embarrasses them. Their ethical duty to advocate the client's cause occasionally interferes with their ability to perceive that they ought to be embarrassed, and rightfully prevents them from being too prissy about resigning from the case as soon as the client threatens to embarrass them. The lawyers cannot be held responsible for what they cannot control. "[A]ny sanctions imposed against [the lawyer] should

to justify his client's continuing violation of the court order. Moreover, Mermelstein was no neophyte; he had been practicing law since 1986. Judge Marsh questioned Mermelstein concerning his eleven years of practice and was able to consider his legal experience when evaluating Mermelstein's conduct before the court.

14. As noted above, the original July 1997 order barred Herman, Mermelstein, and members of their law firm from appearing before the court *pro hac vice*. The modified June 1998 order merely barred Herman and Mermelstein from appearing before Judge Marsh and required other members of the firm who applied for such admission to attach a copy of the sanction order.

be based solely on his 'own improper conduct without considering the conduct of the parties or any other attorney.' " [1]

I concur in footnote 8, vacating the judge's order that Mr. Mermelstein had to stay within the city limits and keep the U.S. Marshal informed of his whereabouts over the weekend, so that he could be put in jail if his client did not return the engines. This is like a bail order for a person who has been indicted but released under strict conditions. No matter how defiant Carnival was, Mr. Mermelstein had the right to go home to Florida, visit a friend in Seattle, or do whatever else he liked over the weekend, without telling the U.S. Marshal where he was. A judge may not hold a lawyer's body as security for his client's compliance with an order. For the rest, I respectfully dissent.

Once the lawyer tells his client about the court order and tells his client that the client ought to comply, the lawyer has performed his duty, and cannot be sanctioned if the client does not comply. If a lawyer does not know that the court has ordered his client to do something, he cannot be sanctioned for failing to tell his client. For Mr. Mermelstein, especially, I can see no basis for any sanction at all, yet his reputation is permanently besmirched. For Mr. Herman, the sanctions are not justified by the record.

Herman was sanctioned for "bad faith" in asserting that he understood the court order to go into effect Monday. The judge did not make a finding that Herman told his client that it could or should violate the court order. Rather, he expressly stated in his order denying reconsideration of sanctions that "the transcript of the contempt hearing ... fails to establish that former defense counsel actually advised defendant to continue using the engines." Herman was on the phone, not physically present at the hearing. There was extensive discussion of how much the bond would have to be on the order. The judge said that he would specify a surety bond of

$250,000 and, according to the transcript, "Upon submission of that to the court the TRO is in [e]ffect." The plaintiff's lawyer, Mr. Fortino, said he had a $2 million surety bond. He then asked for permission to file the $2 million bond and "replace it on Monday" with a $250,000 bond. The judge closed the hearing by saying "I will expect that [the] TRO is now in effect." He followed that remark by saying "And the bond will be replaced Monday morning," and would need to be submitted to a different judge for approval and signature at that time.

This record does not furnish a basis for the district court's "bad faith" finding. Mr. Herman tried to explain at the sanctions hearing that he thought the TRO would not be signed until the bond was placed on Monday. But the judge repeatedly cut him off and would not let him finish what he was saying. Mr. Herman, who was participating by telephone, thought the plaintiff's lawyer had a $2 million bond with him, the court had ordered $250,000, and the court would sign the TRO when the $250,000 bond was submitted Monday. There is every reason to believe that Mr. Herman had an honest misunderstanding, and no substantial basis in the record for the proposition that he was lying.

The majority suggests that Mr. Herman ought to have clarified what the judge meant about when the bond would be effective, immediately or on Monday. Perhaps so. But a lawyer has little reason to ask a judge what he meant when he thinks he understood the judge, the judge has repeatedly told him to be silent, and the lawyer thinks the judge has already given him as favorable an answer as he is likely to get. As for clarifying it with local counsel, we do not know the content of the privileged communications between local and out of town counsel. Even assuming that it would have been prudent to ask the judge whether the bond was in effect as of

1. *Primus Automotive Financial Services, Inc. v. Batarse,* 115 F.3d 644 (9th Cir.1997)(quoting *Martin v. Brown,* 63 F.3d 1252, (3d Cir. 1995)).

the time of the hearing or would go into effect when a judge approved and signed the bond on Monday, failure to exercise all the prudence desirable is not sanctionable as misconduct under the inherent powers of the court.[2] At worst failure to clarify was a mistake rather than defiance of a court order and bad faith. Such a mistake cannot under controlling law support a sanction.[3]

Mr. Herman says in his affidavit that they had a poor telephone connection and he had trouble hearing what the judge said, and he thought Mr. Fortino and the judge were saying "place" the bond Monday instead of "replace" the bond Monday. His statement is corroborated because the transcript in the record is expressly labeled "draft," suggesting that the court reporter had trouble understanding all of what was said. Most importantly, the judge's own syntax was ambiguous as to when the order went into effect. He said "I will expect that the TRO is now in [e]ffect."[4] If he wanted to issue an order that was in effect, he could have said "The TRO is now in effect" without the qualification "I will expect that." The judge's syntax, and his reference to having another judge sign approval of the bond on Monday, opened the door to good faith misunderstanding, and the record does not furnish any substantial reason to doubt

that the misunderstanding was in bad faith.

Despite the ambiguity, Mr. Herman did not tell his client that it could violate the order. Herman says in his affidavit that he told his client that "it *probably* would not *technically* be a violation of the temporary restraining order to fly the aircraft during the weekend" (emphasis added) because the order would technically go into effect when the bond was placed Monday, "but there were certain risks inherent in doing so."[5] That hedged restrained opinion is simply not the same as telling a client to go ahead and violate a court order. Lawyers often properly tell their client in their judgment, the client would not technically be in violation of the law in pursuing a desired course of action, but that there are legal risks in doing so, because often the facts and the law do not allow for greater certainty. In a dramatic courtroom confrontation, the judge asked Carnival's representative if the lawyers told him they could fly the planes, but Carnival's man said the chief executive officer, not the lawyers, told him that. The chief executive officer filed an affidavit saying that "at no time" did anyone from Mr. Herman's firm advise Carnival to continue flying, and that it was a business decision based on logistical problems with complying with the court order. As men-

**2.** *See Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir.1999) (stating that sanctions under the court's inherent power are justified for "the attorney's wilful abuse of the judicial process, bad faith conduct during litigation, or filing frivolous papers").

**3.** *See In re Keegan Management Co.*, 78 F.3d 431, 436 (9th Cir.1996) (stating that a finding of bad faith requires knowing or reckless conduct by an attorney); *see also Mark Industries Ltd. v. Sea Captains's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir.1995) (stating that a clearly erroneous assessment of the evidence is an abuse of discretion).

**4.** The majority points out that the Judge corrected the draft transcript a few days later, replacing "expect" with "direct." This cuts both ways. If the court reporter honestly heard and transcribed it wrong, Herman should not be sanctioned for making the same mistake as the court reporter. It is also possi-

ble that the court reporter got it right and the judge misspoke, as we all do sometimes.

**5.** The majority explains that if Herman believed that the bond was not in effect until Monday, there would have been no risk to Carnival in flying the planes over the weekend. They reason that because Herman acknowledged some risk he must have known that the TRO was currently in effect. But this is not a fair reading of the situation. An action that is "perfectly legal" may still be "risky," particularly when the custody of an item worth hundreds of thousands or even millions of dollars is in question. It is entirely consistent with the record that Mr. Herman thought the order would go into effect when the bond in the proper amount was approved Monday, but that he might be mistaken or the court might regard it as already in effect.

tioned above, the judge expressly stated in his order denying reconsideration of sanctions that "the transcript of the contempt hearing ... fails to establish that former defense counsel actually advised defendant to continue using the engines."

Thus what we have is no finding that Herman told his client to disobey the court's order, and an unsupported finding that Herman spoke in bad faith about what he understood. What mattered is whether Mr. Herman told his client that it could continue to use the planes or engines in violation of the order. The judge had to concede that there was no basis for finding that he did. At worst he misunderstood the word "replace" as "place" and gave his client hedged advice that flying until Monday, when Mr. Herman thought the order would go into effect, would be risky but might not be contempt of court because the bond had not yet been placed. That is not bad faith.

For Mr. Mermelstein, I can see no basis whatsoever for the harsh sanctions imposed on him. He was placed under what amounted to conditions of bail, publicly humiliated, and disbarred from the District of Oregon, at least before this judge, because in response to the judge's request for "an update on what the status of things are," Mr. Mermelstein said Carnival had been "thwarted" from complying with the court's order by practical concerns that made compliance "impossible," so Carnival needed more time to comply.

Mr. Mermelstein explained that some parts were on planes that another creditor had an interest in, and that creditor's seizure of planes had prevented or would prevent Carnival from returning the parts pursuant to the court's order. The judge asked Carnival's management representative what the planes were being used for, learned that they were in revenue service, and the judge said "this has just been a ridiculous violation of my-you two gentlemen are very close to having me call the marshals and put you away, both of you." The judge asked the management representative whether he knew about the

court's order, and he said he had. Mr. Mermelstein interjected that "Carnival was in an untenable position. They could not return the aircraft."

Then the judge asked the management representative what his lawyers advised, "because this is whether this man [Mr. Mermelstein] goes to jail or not." The management representative said that his understanding was that they were not in violation of the court order, but this understanding came from the chief executive officer (who swore that it was a business decision, and had not been the advice of counsel), and did not attribute any such advice to counsel. Then the judge called on local counsel, saying "this man [Mr. Mermelstein] is disqualified and he will never be admitted to this court." The judge then said he was "tempted" to put Mr. Mermelstein and the management representative in custody "until all of the performance required by this has been completed," but then partially relented, introduced Mr. Mermelstein to the deputy United States Marshal and told him to stay within the City of Portland and tell the Marshal where he was going to be. He then, in open court, said "Mr. Mermelstein, now you should really spend a little time examining how you got in the frame of mind that you are in. If a client means that much to you, that you will go to the extremes you have gone to, then you should reassess how you evaluate clients and how you evaluate your life. You are an embarrassment to the profession today."

"Evaluate your life"? "Custody"? "Extremes"? Keep the marshal advised of his whereabouts like a person indicted for a felony and released on bail under especially close supervision? All this was for being asked to give a status report, and disappointing the judge with a report that his client had found compliance "impossible." Had Mr. Mermelstein had a sharper feeling for his own interest, and less concern for his client, he would doubtless have kept his mouth shut and let his client take the full brunt of the court's wrath. The

wrath appears to have been deserved, because the client had not complied with the court's order. But like a good lawyer, Mr. Mermelstein spoke up for his client without protecting himself. And for this, his career is permanently scarred with a harsh sanction reflecting on his integrity. No sanction was justified.

It is important to note that the judge did not even suggest that Mr. Mermelstein had anything to do with whether his client returned the planes or engines in a timely way. Mr. Mermelstein was an associate,[6] and Mr. Herman was the partner who communicated with the client. The court's stated reason for sanctioning Mr. Mermelstein was that the "bad faith arguments former defense counsel raised during the hearing" were "clearly frivolous." As a matter of law, using the word "impossible," in conjunction with an explanation of what he meant by "impossible" (a high degree of commercial impracticality) could not furnish a proper basis for a sanction. A lawyer has a duty to represent his client "zealously" and is permitted and obligated to make such arguments for his client as are arguable.[7]

Mr. Mermelstein's argument may have been unpersuasive or meritless, but it was not frivolous. As Mr. Mermelstein explained it, when one of the three planes containing parts belonging to Pacific Harbor landed in Fort Lauderdale, it was seized by another creditor before Pacific Harbor's parts could be removed. Mr. Mermelstein argued that Carnival could not comply with the order requiring Pacific Harbor's parts to be returned to Fort Lauderdale if other creditors seized the other two planes, as it did the first. The judge took issue with this argument because Pacific Harbor did not attempt to bring the planes to Fort Lauderdale and instead assumed that the other creditor would seize the second and third planes as it did the first. Until the planes were actually seized, the judge suggested that compliance with the order was not yet impossible. The judge was technically correct, but it was not frivolous for Mr. Mermelstein to argue that Carnival correctly assumed that the second and third planes would be seized just as the first had. Instead of surrendering the planes to this almost certain seizure, Carnival negotiated with both Pacific Harbor and its other creditor to permit Pacific Harbor's parts to be removed from the planes of the other creditors. While perhaps misguided, because a party generally must obey a court order despite impracticality, the argument was not frivolous.

Under its inherent powers, a court is justified in imposing sanctions for "the attorney's willful abuse of the judicial process, bad faith conduct during litigation, or filing frivolous papers."[8] "A finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument....'"[9] The order stated, regarding Mr. Mermelstein, that "my sanction order was primarily premised upon the bad faith arguments former defense counsel raised during the hearing." A trial judge needs the power and discretion to use sanctions to punish and deter frivolous arguments that take up considerable time for the court and cause significant expense to adversaries.[10] But this argument was

---

**6.** While Mr. Mermelstein was no "neophyte" it is still important to note that he was not the lead attorney on the case and was merely an associate at Mr. Herman's law firm.

**7.** *See* Or.Code of Prof. Resp., DR 7–101(A)(1), Representing a Client Zealously ("A lawyer shall not intentionally: Fail to seek the lawful objectives of the lawyer's client through reasonably available means permitted by the law and these disciplinary rules...."); DR 7–102(A)(2), Representing a Client Within the Bounds of the Law ("In the lawyer's representation of a client ... a lawyer shall not: ... Knowingly advance a claim or defense that is unwarranted under the law....").

**8.** *Weissman,* 179 F.3d at 1198.

**9.** *Primus Automotive Financial Services, Inc. v. Batarse,* 115 F.3d 644 (9th Cir.1997) (quoting *In re Keegan Management,* 78 F.3d at 436).

**10.** *See id.* at 648.

neither frivolous nor responsible for any cost or delay to anyone.[11] It was a permissible attempt to cushion the client against the full brunt of the judge's expected anger when he learned that the client had still not complied with the court order. Mr. Mermelstein was performing the function we need lawyers to perform—making sure the courts do not overlook facts or law in favor of their clients. Courts need lawyers to do this and should not deter the advocacy they need. A dose of pro se litigation quickly reminds any judge of how much courts need lawyers to help us avoid error. Lawyers should not be afraid to offer excuses for their clients, or pressured to throw their clients to the wolves. I have read the transcript many times, and all I can get out of it is that the judge was so angry at the client's noncompliance with his order that he punished the lawyer who told him about it and who tried to offer an excuse for it. That is an abuse of discretion.

---

11. The majority cites *United States v. Associated Convalescent Enters., Inc.*, 766 F.2d 1342 (9th Cir.1985) and *Wages v. Internal Revenue Service*, 915 F.2d 1230 (9th Cir.1990), in support of 28 U.S.C. § 1927 sanctions, but they are not on point. In *Associated Convalescent* we held that sanctions were not appropriate. *See* 766 F.2d at 1347. In *Wages*, we affirmed sanctions because the sanctioned person repeatedly filed new papers in bad faith after the court had ruled and made it clear that the ruling would stay the same, as contrasted with Mr. Mermelstein's simple oral response to the judge's request for a status report. *See*

915 F.2d at 1233. The statute says that section 1927 sanctions are for one who "multiplies" the proceedings. 28 U.S.C. § 1927. The judge scheduled the hearing at which Mr. Mermelstein spoke regardless of any assurances of compliance with the TRO and what Mr. Mermelstein said was immediately rejected with no hearings or papers, so proceedings were not multiplied.