**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MARKETTE TILLMAN, AKA Ketty P,
*Defendant-Appellant*,

and

JOHN R. GRELE,
*Appellant*.

No. 13-10131

D.C. No.
2:08-cr-00283-
RCJ-PAL-3

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
March 13, 2014—San Francisco, California

Filed June 30, 2014

Before: J. Clifford Wallace, M. Margaret McKeown,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Criminal Law

The panel dismissed criminal defendant Markette Tillman's interlocutory appeal of an order removing John R. Grele as Tillman's counsel, granted Grele's mandamus petition challenging the district court's order sanctioning Grele and referring him to the California State bar for disciplinary proceedings, and vacated the district court's sanctions order.

The panel held that under *Flanagan v. United States*, 465 U.S. 259 (1984), this court lacks jurisdiction over Tillman's claim that counsel was improperly removed, where the removal order is nonfinal and not immediately appealable, and Tillman has the opportunity to raise this issue on direct appeal.

The panel held that mandamus jurisdiction is appropriate to consider the sanctions order because it had an immediate impact on Grele and continues to affect his professional reputation as learned counsel in capital proceedings. The panel held that the district court erred in imposing sanctions without notice and a hearing, and that the order should be vacated.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

John R. Grele (argued), Tiburon, California, for Defendant-Appellant and Appellant.

Daniel G. Bogden, United States Attorney, Elizabeth Olson White (argued), Appellate Chief and Assistant United States Attorney, Office of the United States Attorney, District of Nevada, Reno, Nevada, for Plaintiff-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

This case highlights the tension between judicial efforts to control costs of appointed counsel, the defendant's constitutional right to have counsel appointed, counsel's reliance on timely payment of Criminal Justice Act ("CJA") vouchers, and the delays often present in processing vouchers for payment. In this unusual interlocutory appeal, John R. Grele and his former client, Markette Tillman, appeal an order removing Grele as counsel, sanctioning him, and referring him to the California State bar for disciplinary proceedings. Under *Flanagan v. United States*, 465 U.S. 259 (1984), we lack jurisdiction over Tillman's claim that counsel was improperly removed. The removal order is nonfinal and not immediately appealable; Tillman has the opportunity to raise this issue on direct appeal, if there is one. Grele's petition as to the sanctions order presents a different question, however, because the improper sanctions order not only had an immediate impact on Grele but continues to affect his professional reputation as learned counsel in capital proceedings. We conclude that mandamus jurisdiction is

appropriate to consider the sanctions order, that the district court erred in imposing sanctions without notice and a hearing, and that the order should be vacated.

## FACTUAL AND PROCEDURAL BACKGROUND

Tillman was charged with conspiracy to engage in a racketeer-influenced corrupt organization, in violation of 18 U.S.C. § 1962(d), and other, related offenses in the District of Nevada along with several codefendants. Pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq*., the indictment included special findings regarding an alleged murder. Grele was appointed *pro hac vice* as counsel "learned in the law applicable to capital cases" pursuant to 18 U.S.C. § 3005 and the CJA, 18 U.S.C. § 3006A. Although the Department of Justice ultimately declined to seek the death penalty, Grele remained Tillman's attorney.

Nearly five years after the filing of the indictment, Grele began an exchange with the court regarding payment of his CJA vouchers. On February 14, 2013, Grele sent an e-mail to a financial specialist at the court. The e-mail stated:

> I see that the judge has still not signed the voucher although he signed others that were before him at the same time several weeks ago. As I have had no communications regarding the voucher, I assume it is fine, otherwise I would have heard something by now. I'm sorry to have to suspend work on the case, including any efforts to resolve the case by way of plea, but that appears to be what I have to do to be able to work on paying

matters and meet my financial obligations to my family.

Having reviewed Grele's e-mail to the financial specialist, the judge wrote back in a February 20 e-mail to Grele:

> You must be aware . . . that you cannot withdraw from such representation without approval of the District Court under our rules, and only upon a showing of good cause. Your suggestion below that you would suspend work or other efforts on this case, for whatever reason, without prior Court approval, violates our rules, is contrary to ethical standards for both the Nevada and California Bars, and violates your obligation to provide effective and competent representation to the Defendant.

Grele responded immediately:

> Thank you, Your Honor, for the opportunity to set the record straight regarding CJA matters in this case. The Court may rest assured that I would file a notification and ask to appear before I completely halted work on this or any other matter. . . .
>
> The Court may wish to familiarize itself with the 10 pending CJA requests in this case. . . .
>
> The Court may also wish to familiarize itself with the Guide to Judiciary Policy, vol. 7, chapter 2, section 230.13(b), which requires

payment within 30 days of submission of counsel's voucher.

The court then set a status hearing, which it characterized as a "hearing regarding the continued representation" of Tillman by Grele. The hearing focused almost entirely on budget issues. Grele "expressed concerns regarding the court's timely signature of his [CJA] vouchers and payment thereof." The district judge expressed concern about excessive billing by Grele, his paralegal, and his investigators noting that the total bill was "approaching a million dollars."

The court first noted its concern with the overall level of billing in light of its review of an annual list of cases and expenditures provided by the Ninth Circuit, which has oversight authority over certain aspects of CJA expenses. However, as the court noted, "[t]hat's not an indication from the Circuit that they're displeased, or that there's a problem, or that you're overbilling . . . we just need to be circumspect and careful." The court apologized because in rejecting several vouchers, the court "went beyond the time that Mr. Grele was normally relying upon to get his vouchers handled and paid, and [Grele] wanted to note that to [the financial specialist]."

A second concern related to further budget requests for investigators and for a second attorney. After some discussion, the court said it would approve a new voucher for certain expert and investigation fees.

The final concern related to Grele's February 14, 2013 e-mail, which the judge acknowledged was transmitted in accord with local rules and was appropriate under the circumstances. The questions the judge raised were whether

Grele was "providing . . . effective assistance to the best of [his] ability," and whether he would give the court his "reassurance that [he] will devote full time in [his] judgment necessary to provide effective and competent counsel to Mr. Tillman." Grele responded, "[t]hat is my hope and effort, [Y]our Honor."

Following that exchange, there was a lengthy discussion about the complexity of the case, the request for second counsel, and the overall budget for the case. Grele promised to consider how he could reduce the budget.

Later in the hearing, when asked if he was "withdrawing from the case," Grele explained that although his e-mail was inelegantly phrased, he "did not mean it that way," and he was not, as the judge put it, "withdrawing from the case . . . temporarily, if not permanently, until the vouchers were paid." Grele also explained that the statement in his e-mail regarding suspension of work on the case was "supposedly [] prospective" because of the "position [he had] been placed in." The court repeatedly asked Grele for his "assurance" that he would provide effective assistance of counsel to the best of his ability. Grele attempted to explain that "if there is delay of payment, it puts me in a conflict position . . . . For instance, if the [c]ourt does not approve investigative funding, which it did not, no lawyer would — no matter how good their efforts are, would be considered to be competent. But that's not the lawyer's fault. The lawyer is doing whatever the lawyer can, and that's the fault of the system . . . ."

The district court told Grele that he could not withdraw from the case because he did not get "a voucher paid right exactly on time." The court found that "part of Mr. Grele's motivation here is to set it up for [a] 2255 [motion] and/or set

it up for delay or severance," and the judge stated that he would remove Grele as counsel if he could not assure the court that he would provide "competent, effective assistance to Mr. Tillman." Grele later responded, "[i]f I get paid in a timely fashion, I can represent [that] I can provide effective assistance of counsel." He also stated, "I make the assurance that I will do my best for Mr. Tillman, and I have done my best for Mr. Tillman . . . ." The district court nonetheless concluded, "[B]asically what you're doing is you're extorting the [c]ourt."

Later that day, the district court entered an order containing the following factual findings:

> 1. Mr. Grele was attempting to extort the court by delay or withdraw[al] of representation into prioritizing the signature of his vouchers and the approval of extraordinary and inappropriate budget requests and voucher requests for counsel, second counsel, paralegal, investigators and forensic experts;

> 2. Mr. Grele was violating his ethical obligations of representation to a client;

> 3. Mr. G[r]ele was attempting to manufacture an ineffective assistance of counsel claim on behalf of the Defendant; and

> 4. Mr. Grele had threatened and in fact had delayed or withdrawn from representation in certain respects, all without the approval of the court as required by local rule.

> Finally upon the court's requests for assurance that Mr. G[r]ele would provide effective assistance and competent representation of the defendant going forward through trial proceedings, Mr. Grele refused to give such assurance.

The district court directed that a copy of the order "be referred to the State of California Bar Association for violation of Mr. Grele's ethical obligations under professional code, for abandonment of representation of his client . . . without prior court approval."

New counsel was appointed for Tillman. In proceedings following Grele's removal, the district court stated that Grele was part of a coordinated strategy by criminal defense attorneys to delay capital proceedings in order to wear down the government's will to pursue capital punishment.

Because of the court's trial schedule, the district judge recused himself and requested reassignment to a different judge. This matter has been reassigned, and trial is pending.

The State of California Bar Association dismissed the referral at the investigatory stage. As Grele represented at oral argument on appeal, the bar "ha[s] determined not to go forward" with any discipline.

## ANALYSIS

### I. Disqualification of Counsel

The question of jurisdiction over Tillman's interlocutory appeal of the nonfinal order disqualifying and removing Grele

as his counsel falls squarely within the Supreme Court's decision in *Flanagan*, 465 U.S. 259. The final judgment rule, which ordinarily limits appeals to final decisions, has particular force in the field of criminal law. *Cobbledick v. United States*, 309 U.S. 323, 325–26 (1940). The Supreme Court has established three conditions for a collateral appeal of a nonfinal order: "First, [the order] must conclusively determine the disputed question; second, it must resolve an important issue completely separate from the merits of the action; third, it must be effectively unreviewable on appeal from a final judgment." *Flanagan*, 465 U.S. at 265 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)) (internal quotation marks omitted).

In *Flanagan*, the Supreme Court held that "[a]n order disqualifying counsel lacks the critical characteristics that make orders . . . immediately appealable." 465 U.S. at 266. The Court reasoned that a judgment of acquittal or a direct appeal could vindicate the defendant's right to a certain counsel. *Id.* at 267. The Court also determined that a disqualification order "is not independent of the issues to be tried," and that "[i]ts validity cannot be adequately reviewed until trial is complete" because it requires an evaluation of prejudice to the defendant. *Id.* at 268–69. Under *Flanagan*, we lack jurisdiction over the disqualification of counsel order.

Tillman argues that despite *Flanagan* we have pendent appellate jurisdiction to review collaterally the order disqualifying Grele as counsel because it is "inextricably intertwined" with the sanctions order over which we have jurisdiction. "Pendent appellate jurisdiction refers to the exercise of jurisdiction over issues that ordinarily may not be reviewed on interlocutory appeal, but may be reviewed on interlocutory appeal if raised in conjunction with other issues

properly before the court . . . [and] if the rulings were 'inextricably intertwined' or if review of the pendent issue was necessary to ensure meaningful review of the independently reviewable issue." *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000). We decline to exercise pendent appellate jurisdiction over the disqualification of counsel appeal because although the orders are "intertwined," they are not "inextricably" so. *See id.* ("We have consistently interpreted 'inextricably intertwined' very narrowly."). The validity of the disqualification order may be addressed either through a judgment of acquittal or a direct appeal, if there is one. We also decline to grant the petition for a writ of mandamus for the disqualification order because other avenues exist to vindicate Tillman's right to a particular counsel. *See Cole v. U.S. Dist. Court for Dist. of Idaho*, 366 F.3d 813, 822–23 (9th Cir. 2004). We therefore dismiss Tillman's appeal from the disqualification of counsel order for lack of jurisdiction.

## II. Sanctions Order Against Grele[1]

Grele challenges the district court's order as an improper sanction and requests that we exercise mandamus jurisdiction to vacate the order. The district court's order made factual findings and "reached a legal conclusion that [Grele] knowingly and wilfully violated a specific rule of ethical

---

[1] The government advocated for dismissal of Tillman's appeal under *Flanagan*, but took no position with respect to Grele's appeal. In its brief, the government recognized "the importance that appointed defense attorneys operate independently of the prosecution," and that "federal law and administrative policy has long precluded participation by the U.S. Attorney's Offices in CJA-related matters." It took the same position with respect to the court's supervisory authority over the matter of Grele's discipline.

conduct. Such a finding, *per se*, constitutes a sanction." *United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000). We construe Grele's portion of the appeal as a petition for a writ of mandamus. *See Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) ("We may treat an appeal from an otherwise nonappealable order as a petition for a writ of mandamus."); *Stanley v. Woodford*, 449 F.3d 1060, 1062 (9th Cir. 2006) (holding that under 28 U.S.C. § 1291, the court lacked "appellate jurisdiction to entertain a prejudgment appeal of an order imposing sanctions on a non-party attorney [who] no longer represent[ed] any party in the underlying case . . . ."). *Cf. Talao*, 222 F.3d at 1137 (stating in mandamus action that a prejudgment sanctions order was "an appealable sanction"). We exercise our mandamus jurisdiction, grant the petition, and vacate the order.

Under 28 U.S.C. § 1651, this court has "the power to issue a writ of mandamus in aid of its appellate jurisdiction." *California v. Mesa*, 813 F.2d 960, 962 (9th Cir. 1987) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943)); *see* 28 U.S.C. § 1651(a) (providing that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *In re Van Dusen*, 654 F.3d 838, 840 (9th Cir. 2011) (internal quotation marks omitted).

Our court considers five factors (the "*Bauman* factors") to evaluate whether to exercise mandamus jurisdiction:

> (1) [W]hether the petitioner has other adequate means, such as a direct appeal, to attain the relief he or she desires; (2) whether

the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order makes an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems, or legal issues of first impression.

*In re Van Dusen*, 654 F.3d at 841 (quoting *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977)) (internal quotation marks omitted). "A petitioner need not establish all five factors, and we will weigh the factors together based on the facts of the individual case." *United States v. Fei Ye*, 436 F.3d 1117, 1122 (9th Cir. 2006) (internal citation omitted).

The first factor regarding alternative means to obtain relief weighs in favor of granting the writ. The sanctions order and the disqualification order are intertwined. Because the disqualification order itself is not collaterally appealable, *see Flanagan*, 465 U.S. at 267, if Tillman accepts a plea agreement or is acquitted, it is unlikely that the removal order will ever be reviewed. *Cf. Fei Ye*, 436 F.3d at 1123 (granting government's petition for a writ of mandamus in part in light of the fact that the error would not be reviewable on appeal because if the defendants were acquitted double jeopardy would bar the appeal, and if they were convicted there would be no prejudice). As to the sanctions portion of the order, there is no other avenue for relief from the immediate and ongoing harm to Grele's professional reputation.

This continuing harm also tilts the second *Bauman* factor, whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal, in favor of exercising our mandamus jurisdiction.   As Grele represented at oral argument on appeal, the continued existence of the order has collateral effects on his reputation and professional endeavors.  He is "a death penalty specialist" who has been qualified as learned counsel in many districts, and his ability to participate in capital proceedings is critical to his clients and to his own livelihood.  Grele represents that judges have already questioned him about the ethical implications of the order entered in this case.  The order was also referenced in the district court's publicly-available opinion denying Tillman's speedy trial motion, which memorializes the court's concern that Grele would not competently represent Tillman.[2]

We agree that the existence of the sanctions order may influence judges to think twice before appointing Grele as counsel, despite his qualifications.  Although the damage is

---

[2] The substance of the court's discussion of the sanctions order is as follows:

> The recent seven-month delay due to the latest continuance from April 2013 to November 2013, which delay cannot be attributed to Defendant, was a result of the [c]ourt's concern that Defendant's previous counsel would not competently represent him.  Although Tillman initially verbally objected at the hearing where the [c]ourt disappointed Attorney Grele, Tillman has since asked the [c]ourt to continue the trial at least three more times.

*United States v. Tillman*, No. 08-CR-00283, 2013 WL 5741414, at *2 (D. Nev. Oct. 22, 2013).

already done in part, there is no reason to prolong it; through mandamus we can offer Grele some relief.

Lawyers do not have a ready "toolkit" for their profession. Instead, their professional reputations are the essence of their livelihood. Reputations matter—to the court, to clients, to colleagues, and to the public. In a specialized arena, such as criminal defense, the professional circle is even more circumscribed. Appointed lawyers representing indigent clients in federal cases rely on public funds which, in turn, are controlled in part by the judiciary. To be sure, the judiciary and the lawyers have an obligation to be stewards of CJA funds. But this oversight should not trade off with the rights of clients. Nor should such supervision ignore the practical reality that inordinate delays in processing CJA vouchers stretch lawyers to their economic limits.

Most importantly, the third *Bauman* factor, whether the district court's order was clearly erroneous, weighs in favor of granting the writ of mandamus. *See Cole*, 366 F.3d at 820 ("Absence of this factor is often dispositive of the petition."). After Grele spent years as Tillman's counsel, the district court improperly removed him for highlighting a problem with the voucher payments, which the district court admitted were untimely, and the court did so without giving Grele any notice or opportunity to be heard.

The Supreme Court has plainly stated that it "do[es] not consider a lawyer's criticism of the administration of the [CJA] . . . cause for discipline or suspension." *In re Snyder*, 472 U.S. 634, 646 (1985). The Court has approved of letters from counsel to "a court employee charged with administrative responsibilities . . . concern[ing] a practical matter in the administration of the [CJA]." *Id.* Grele's e-

mails to the financial specialist and the judge brought to the court's attention problems with the administration of the CJA, namely with regard to timely voucher payments. "Officers of the court may appropriately express criticism on such matters." *Id.* The statements for which Grele was sanctioned did not merit any sanction under Supreme Court precedent. Grele's critique, whether or not justified, was not, as the district court suggested, tantamount to extortion.

The district court's determination of an ethical violation, its disqualification order, and its referral to the state bar without giving Grele any notice or opportunity to be heard violated our clearly established law: "Ninth Circuit law does not permit a summary disqualification of counsel; for the court to sanction an attorney, procedural due process requires notice and an opportunity to be heard." *Cole*, 366 F.3d at 821 (citing *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000)). *Cf. Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001) ("[R]evocation of *pro hac vice* status is a form of sanction that cannot be imposed without notice and an opportunity to be heard."). The district court clearly erred in summarily issuing the sanctions order without giving Grele notice and an opportunity to be heard, particularly over Grele's representations that he never ceased working on the case and that he would "provide effective assistance of counsel" and do his "best for Mr. Tillman."

What began as a status hearing about an e-mail exchange over vouchers ballooned into a full-blown hearing on attorney sanctions. Nothing in the notice of the hearing gave even a hint that the hearing would be directed to topics as wide-ranging as violation of attorney ethics, extortion, and manufacturing an ineffective assistance of counsel claim.

The question here is not one of interpretation of fair notice; the reality is that, contrary to our precedent, there was no notice. *See Cole*, 366 F.3d at 821.

During the hearing, despite Grele's efforts to explain what had occurred regarding the payment of vouchers, the judge kept pressing him and said he would have to replace him as counsel unless Grele could assure the court "that he will provide effective assistance come hell or high water." Time and again, Grele said, "I gave you my assurance that I would represent Mr. Tillman to my fullest capabilities. I gave you that assurance." He also explained that "there are external features of the case" that affect competence and went on to note that a lack of investigative funding could not be the lawyer's fault.

The court's post-hearing findings went beyond what was addressed at the hearing, and Grele had no opportunity to be heard on those findings. For example, the court found that Grele "had threatened and in fact had delayed or withdrawn from representation in certain respects" without court approval. The record does not support such a finding. Grele had not stopped work on the case, and he specifically represented that he would never withdraw without court approval. Likewise, the court's finding that Grele was attempting "to extort the court" by seeking approval of "inappropriate budget requests" is totally at odds with a rational discussion between the court and counsel about the budget and Grele agreeing to try to fit into the budget. Other findings are similarly flawed.

As the hearing wore on, the district court began raising questions of whether there were ethical violations involving Grele, none of which were part of any pre-hearing notice. It

is fair to say that both Grele and the court were frustrated by voucher issues, but this circumstance was hardly a justification for a harsh attack on court-appointed defense attorneys.  For decades, the administration of the CJA has been a source of tension between CJA attorneys and the judges tasked with overseeing the CJA program.  *See, e.g.*, *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) (suit involving a group of attorneys in the District of Columbia who planned a strike to increase compensation under the CJA).  Indeed, reluctance to provide adequate funding for CJA attorneys, at times, has created "difficulty in attracting qualified attorneys to act as court-appointed counsel for the indigent."  Richard Klein, *The Eleventh Commandment: Thou Shalt Not Be Compelled to Render the Ineffective Assistance of Counsel*, 68 Ind. L.J. 363, 365 (1993).  "[M]ajor empirical studies unanimously have concluded that inadequate funding stands as the most prominent barrier to the provision of effective assistance of counsel."  Albert L. Vreeland, II, Note, *The Breath of the Unfee'd Lawyer: Statutory Fee Limitations and Ineffective Assistance of Counsel in Capital Litigation*, 90 Mich. L. Rev. 626, 641 (1991).  Grele's statements to the district court merely echoed these critiques and offered a personal example; they were not, however, "cause for discipline."  *See Snyder*, 472 U.S. at 646.

Of particular concern is the court's broad statement regarding the criminal defense bar, claiming that Grele was "part and parcel" of a coordinated "strategy" by criminal defense attorneys to "kill the motivation of the U.S. Attorney" so that the government would capitulate on capital punishment.  Notably, this charge was offered with no foundation; it unfairly implicates attorneys who represent

defendants in the most difficult cases and unfairly suggests that U.S. Attorneys would cave to such pressures.

The district court's order was a clear violation of well-established principles governing the removal of counsel and, hopefully, was directed solely at one individual attorney. Therefore, "it is likely not an 'oft-repeated' error," nor does it present a novel question. *Fei Ye*, 436 F.3d at 1124. Accordingly, the fourth and fifth *Bauman* factors do not weigh in favor of granting the petition.

The balance of the factors, particularly satisfaction of the clear error factor, weighs in favor of granting the petition for a writ of mandamus. *See Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007) (noting that "all five factors need not be satisfied at once" to grant mandamus relief (citation omitted)). The petitioner has made a "clear and indisputable" case that he is entitled to the writ. *See Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976). We grant the petition and vacate the order.

The parties shall bear their own costs on appeal.

**DISMISSED in part; VACATED in part; GRANTED in part.**