229 F.3d 1271 (9th Cir. 2000)
 ROBERT CUNNINGHAM; ARMAND SOLY, in his individual capacity & as successor in interest to his deceased son, Daniel Soly, & in his capacity as a representative of the classes described fully herein below; BETTY SOLY, in her individual capacity & as successor in interest to her deceased son, Daniel Soly, & in her capacity as a representative of the classes described fully herein below, Plaintiffs-Appellees,
v.
DARYL GATES, Defendant,
WILLIAM L. WILLIAMS; RICHARD ALARCON; RICHARD ALATORRE; HAL BERNSON; MARVIN BRAUDE; LAURA CHICK; JOHN FERRARO; MICHAEL FEUER; RUTH GALANTER; JACKIE GOLDBERG; MICHAEL HERNANDEZ; NATE HOLDEN; MARK RIDLEYTHOMAS; RUDY SVORNICH; JOEL WACHS; RITA WALTERS; HERBERT BOECKMANN; RAYMOND FISHER; DEIRDRE HILL; ART MATTOX; EDITH PEREZ; GARY GREENBAUM; ENRIQUE HERNANDEZ; MARY BURWELL-COOPER; JANET G. BOGIGIAN; ELLEN M. FAWLS; MICHAEL K. FOX; JAMES K. HAHN; KATHERINE J. HAMILTON; RICHARD M. HELGESON; THOMAS C. HOKINSON; STUART D. HOTCHKISS; ANNETTE KELLER; LENORE LASHLEY; HONEY A. LEWIS; WARD G. MCCONNELL; JOHN T. NEVILLE; JAMES H. PEARSON; ROBERT J. PULONE; PHLLIP SHINER; PHILLIP J. SUGAR; FLORA TROSTLER; DON W. VINCENT, II; G. DANIEL WOODARD; JOSEPH CALLIAN; BRIAN DAVIS; JOSEPH FREIA; EDWARD GUIZA; JAMES HARRIS; RICHARD SPELMAN; JAMES TIPPINGS; JOHN TORTORICI; LAWRENCE WINSTON; PHILLIP JAMES WIXON; GARY ZERBY; RICHARD ZIERENBERG; TAYO POPOOLA; JERRY BROOKS; JOHN D. WHITE; DENNIS CONTE; GREGORY BERG; RANDOLPH MANCINI; JOHN TRUNDLE; ROBERT ROCHHOFT; DANIEL KOENIG, Defendants-Appellants.
ROBERT CUNNINGHAM; ARMAND SOLY, in his individual capacity & as successor in interest to his deceased son, Daniel Soly, & in his capacity as a representative of the classes described fully herein below; BETTY SOLY, in her individual capacity & as successor in interest to her deceased son, Daniel Soly, & in her capacity as a representative of the classes described fully herein below, Plaintiffs-Appellees,
v.
DARYL GATES, Defendant,
CITY OF LOS ANGELES; WILLIAM L. WILLIAMS; JOHN HELMS; JOSEPH CALLIAN; BRIAN DAVIS; JOSEPH FREIA; EDWARD GUIZA; JAMES HARRIS; RICHARD SPELMAN; JAMES TIPPINGS; JOHN TORTORICI; LAWRENCE WINSTON; PHILLIP JAMES WIXON; GARY ZERBY; RICHARD ZIERENBERG; JERRY BROOKS; JOHN D. WHITE; GREGORY BERG; JOHN TRUNDLE; ROBERT ROCHHOFT; DANIEL KOENIG, Defendants-Appellants.
GROVER SMITH, Plaintiff-Appellee,
v.
DARYL GATES, Defendant,
RICHARD ALATORRE; HAL BERNSON; LAURA CHICK; MICHAEL FEUER; MICHAEL HERNANDEZ; MARK RIDLEY-THOMAS; JOEL WACHS; RITA WALTERS; RAYMOND FISHER; ART MATTOX, Defendants-Appellants.
ROBERT CUNNINGHAM; ARMAND SOLY, in his individual capacity & as successor in interest to his deceased son, Daniel Soly, & in his capacity as a representative of the classes described fully herein below; BETTY SOLY, in her individual capacity & as successor in interest to her deceased son, Daniel Soly, & in her capacity as a representative of the classes described fully here in below; GROVER SMITH; G. NICOLETTI; D. LYONS; MICHAEL SMITH, Plaintiffs-Appellees,
v.
DARYL GATES, Defendant,
WILLIAM L. WILLIAMS; JOHN HELMS; BRIAN DAVIS; JOSEPH FREIA; RICHARD SPELMAN; LAWRENCE WINSTON; PHILLIP JAMES WIXON; RICHARD ZIERENBERG, Defendants-Appellants.
GROVER SMITH; UNKNOWN, Fifty Unknown Named Plaintiffs, all in their capacities as representatives of the classes described fully here in below; DOE ALPHA, in his/her capacity as a representative of the class described fully here in below; ROE BETA, in his/her capacity as a representative of the class described fully here in below, Plaintiffs-Appellees,
v.
DARYL GATES, Defendant,
JAMES K. HAHN; THOMAS C. HOKINSON; ANNETTE KELLER; JAMES H. PEARSON; DON W. VINCENT, II; G. DANIEL WOODARD, Defendants-Appellants.
GROVER SMITH; UNKNOWN, 50 UNKNOWN NAMED PLAINTIFFS ALL IN THEIR INDIVIDUAL CAPACITIES AND ALL IN THEIR CAPACITIES AS REPRESENTATIVES OF THE CLASSES DESCRIBED FULLY HERE IN BELOW; DOE ALPHA, in his/her capacity as a representative of the class described fully here in below; ROE BETA, in his/her capacity as a representative of the class described fully here in below, Plaintiffs-Appellees,
v.
DANIEL KOENIG; JAMES TIPPINGS; JAMES TOMA; CHARLIE BENNETT; RODNEY RODRIGUEZ; GARY HOLBROOK; JOHN FRUGE; JAMES HARRIS; ROBERT KRAUS; JAMES KILGORE; ANGELA DUMLER, Defendants-Appellants.
 Nos. 98-55108, 98-55208, 98-55855, 98-56077, 98-56081, 99-55136
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 9, 2000
Filed September 15, 2000
Amended October 31, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Lisa S. Berger, Deputy City Attorney, Los Angeles, California, and Louis R. Miller, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles, California, for the defendants-appellants.
 Stephen Yagman (Argued) and Marion R. Yagman, Yagman & Yagman, Venice, California, for the plaintiffs-appellees.
 Appeals from the United States District Court for the Central District of California J. Spencer Letts, District Judge, Presiding D.C. No.CV-96-02666-JSL D.C. No. CV-96-02666-JSL D.C. No. CV-97-01286-JSL D.C. No.CV-96-02666-JSL D.C. No.CV-97-01286-JSL D.C. No.CV-97-01286-JSL
 Before: Michael Daly Hawkins, Frank Magill,[1] and Sidney R. Thomas, Circuit Judges.
 MAGILL, Senior Circuit Judge:
 
 
 1
 This consolidated appeal requires us to decide whether certain Los Angeles city officials are entitled to qualified immunity from suits initiated by several alleged victims of excessive force by the Los Angeles Police Department (LAPD). In three separate lawsuits, Robert Cunningham, Grover Smith, and the parents of Daniel Soly,[2] sued the city of Los Angeles (City) and numerous City officials, alleging the defendants either used excessive force, acquiesced in the use of excessive force, or engaged in an unconstitutional policy of indemnifying LAPD officers against punitive damage awards in excessive force cases.[3] Defendants in the Cunningham and Soly actions moved for summary judgment based on qualified immunity from suit and Heck v. Humphrey, 512 U.S. 477 (1994).[4] The district court[5] granted summary judgment to the City's mayor, Richard Riordan, but otherwise denied all motions for summary judgment.[6]See Cunningham v. Gates, 989 F.Supp. 1256 (C.D. Cal. 1997); Cunningham v. Gates,989 F.Supp. 1262 (C.D. Cal. 1997). Defendants in the Smith action also moved for summary judgment based on qualified immunity. In denying the Smith defendants' motions for summary judgment, the district court incorporated the reasoning as set forth in its earlier decisions denying the defendants' motions for summary judgment in the Cunningham and Soly actions. For reasons to be discussed, we affirm in part and reverse in part.
 
 I. Background
 
 2
 All of these actions arise out of the actions and conduct of a special unit of the LAPD--the Special Investigation Services (SIS)--whose purpose was to interdict and apprehend armed, violent career criminals.
 
 A. The Cunningham/Soly Robbery
 
 3
 On May 3, 1995, LAPD detectives received information concerning Cunningham and Soly's involvement in a Simi Valley armed robbery. Having received additional information concerning Cunningham and Soly's criminal activities, SIS members placed Cunningham and Soly under surveillance at approximately 3:00 p.m. on June 26, 1995. After observing the suspects for several hours, SIS officers followed them to what they believed would be the scene of a robbery--the Southwest Liquor and Deli in Newbury Park, California. The officers permitted Cunningham and Soly to rob the store, although the officers had both probable cause and the ability to arrest the armed duo before the robbery was committed. After allowing the two robbers to leave the store and enter their getaway car, SIS officers used their police cars to "jam"[7] Cunningham and Soly's car into a confined space, thus preventing them from escaping in their vehicle. According to plaintiffs, the officers then, without announcing themselves as police, opened fire with approximately eighteen shotgun blasts and handgun shots, which resulted in Soly's death and Cunningham's permanently disabling injuries. The defendants claim that Cunningham and Soly fired the first shots, a claim supported in Cunningham's criminal trial, where a California jury rejected Cunningham's claim that the officers provoked the use of force.
 
 B. The Grover Smith Shooting
 
 4
 On February 25, 1997, SIS members conducted a surveillance operation focusing on the activities of robbery suspect Michael Smith.[8] On the night of the shooting, SIS detectives observed Michael Smith and three other suspects enter the Classroom Bar with their jacket hoods pulled up over their heads. Shortly thereafter, they exited the bar and drove out of an alley in a Mercury Topaz.
 
 
 5
 SIS Detectives Lawrence Winston and Richard Spelman were part of the surveillance team. A radio announcement informed them of the armed robbery of the Classroom Bar and the suspects' escape by car. A police helicopter broadcasting the suspects' movements reported that their Mercury had driven into a cul-de-sac at Corbin Avenue and Schoenborn Street. Detectives Winston and Spelman approached the location and observed two SIS units converging on the Mercury. They saw muzzle flashes coming from the Mercury and heard the sound of gunfire.
 
 
 6
 The front passenger door of the Mercury opened and an African-American male wearing dark clothing exited the vehicle and began running towards nearby houses. Detectives Winston and Spelman drove north on Corbin and pulled into a driveway to block the armed suspect's escape. They heard a broadcast reporting the suspect heading in their direction. Immediately thereafter, they saw a young African-American, wearing a white long-sleeved t-shirt and dark jeans, standing on the east side of Corbin. He was looking up and down the street and saw the helicopter. He moved north toward a large tree in front of 8400 Corbin Avenue, hiding for a moment between the tree and the house.
 
 
 7
 Detectives Winston and Spelman drove toward the man who they believed was the escaped robber, Michael Smith. In fact, the man was not the escaped robber. Rather, the man was plaintiff Grover Smith. Smith had just returned home that evening when he heard the police helicopter flying overhead. Because he had outstanding warrants for his arrest and because police had visited his house earlier in the evening to demand he turn his stereo volume down, Smith mistakenly assumed that the helicopter and police were there for him.
 
 
 8
 Yelling, "They're coming for us," he rushed out to the backyard, hoping to hide in his garage. He hopped over the wall into a neighbor's front yard and started walking north on Corbin. When he saw the officer's Jeep approaching, he turned and started running the other way. A second car blocked his path. He heard someone yell, "Freeze, " and was shot in the leg. Defendants claim they shot at Smith only after he moved his hand towards his waistband as if reaching for a gun. Smith denies making any threatening movements.
 
 
 9
 C. A "Course of Unlawful Conduct"
 
 
 10
 Plaintiffs allegations go beyond the immediate circumstances surrounding their shootings. In addition to arguing SIS officers lacked probable cause to use deadly force against them at the time of the shootings, plaintiffs allege they were victims of a "course of unlawful conduct" developed and engaged in by SIS members. Plaintiffs allege evidence of the officers' conduct in the common course incidents, taken together with other evidence, will establish a continuing "course of unlawful conduct" which has the following elements:
 
 
 11
 1. SIS officers commence surveillance of one or more identified persons suspected of having committed prior armed robberies characterized by a particular modus operandi.
 
 
 12
 2. On a night when a new robbery is expected to occur, SIS officers commence surveillance at or around the time the suspects enter their car on the way to the robbery.
 
 
 13
 3. They follow the suspects to the scene of the sus pected robbery.
 
 
 14
 4. They ignore probable cause to arrest, and allow the robbery to occur without any effort to pre vent it.
 
 
 15
 5. After the robbery is complete, they "jam " the suspects in a confined space at or inside the sus pects' car.
 
 
 16
 6. Whether or not the suspects offer any actual or legitimately perceived threat, the officers com mence shooting at the suspects, and do not stop shooting until all but one of the suspects is dead.
 
 
 17
 7. They cover up the truth of the relevant events by fabricating evidence that officers only shot per sons who posed an immediate threat to the officers or others, and by corroborating the existence of such threats through falsification of police reports and providing perjurious testimony at both civil and criminal trials.
 
 
 18
 According to plaintiffs, the unlawful "course of conduct" outlined above is knowingly condoned by other named public official defendants, all of whom are in a position to prevent it. Specifically, plaintiffs contend all of the public official defendants knowingly maintain policies that intentionally ignore the officers' "code of silence," assume the truthfulness of officers' versions of use of force events, and unfairly discount or ignore all impeaching evidence. According to plaintiffs, these policies allow police officers to escape accountability for their unconstitutional acts of excessive force. Plaintiffs further argue that SIS officers knowingly rely on these policies and practices when committing unlawful acts of excessive force.
 
 II. District Court Proceedings
 A. The Cunningham/Soly Lawsuits
 
 19
 Based on the facts and allegations described above, plaintiffs Cunningham and Soly brought a section 1983 action[9] against the City and the following City officials: 1) SIS officers who participated in the gunfight following the armed robbery of the Southwest Liquor and Deli,[10] 2) SIS officers who participated in the surveillance operation, but did not actually use force against either Cunningham or Soly,[11] 3) various supervising officers who had the alleged authority to control the conduct of SIS officers,[12] 4) police commissioners, 5) various members of the city council, 6) the mayor,[13] and 7) several assistant Los Angeles city attorneys. Given the number of defendants involved in this case, the procedural history of this case is quite lengthy and complex. We review only the relevant aspects of the procedural history of this case.
 
 1. Heck v. Humphrey
 
 20
 On February 10, 1997, all defendants moved for summary judgment against Cunningham and Soly pursuant to Heck v. Humphrey, 512 U.S. 477 (1994), which holds that a claim under section 1983 that would necessarily imply the invalidity of the plaintiff's state criminal conviction or sentence is not cognizable until the conviction or sentence is overturned. Defendants argued that a finding that the officers used excessive force would invalidate the criminal jury's determination that the officers were justified in using deadly force against Cunningham.[14] The district court rejected these arguments, ruling that "Heck does not apply to suits that allege official misconduct unrelated to legal process, such as an unconstitutional arrest without a warrant or the use of excessive force on the arrested person." The district court also found that Heck could not bar Soly's section 1983 action because Soly was never prosecuted for events underlying the present lawsuit. Defendants appeal the district court's ruling.
 
 2. Qualified Immunity
 
 21
 With the exception of all but one of the officers who participated in the gunfight with Cunningham and Soly, defendants moved for summary judgment based on qualified immunity. The non-shooting officers[15] argued that plaintiffs failed to show that they had the opportunity to intercede or otherwise caused plaintiffs to suffer constitutional injury. Council members argued that indemnifying officers against punitive damages on a discretionary, case-by-case basis, in good faith compliance with the requirements of California Government Code Section 825(b),[16] entitles them to qualified immunity under Trevino v. Gates, 99 F.3d 911 (9th Cir. 1996). The City attorneys argued that 1) plaintiffs are third parties to whom the city attorney defendants owe no duty and 2) there was no clearly established law at the time of the Cunningham/Soly robbery that a policy of indemnifying officers against punitive damage awards would violate a private citizen's constitutional rights. The police commissioners and supervisors also moved for summary judgment, arguing that the plaintiffs failed to establish that they violated clearly established law.[17] In two separate opinions, the district court denied virtually all of the defendants' motions for summary judgment. See Cunningham v. Gates, 989 F.Supp. 1256 (C.D. Cal. 1997); Cunningham v. Gates, 989 F.Supp. 1262 (C.D. Cal. 1997).
 
 
 22
 a. Denial of SIS officers' motions for summary judgment
 
 
 23
 As previously mentioned, the district court denied the non shooting officers' motion for summary judgment. Rather than analyze the individual actions of each officer, the district court focused on plaintiffs' allegations of a department-wide scheme and the actions of the officers who actually shot Cunningham and Soly. The court first found a disputed fact issue concerning whether officers had probable cause to shoot Cunningham and Soly, explaining that:
 
 
 24
 The officers' explanations of why they did not think that they had probable cause to arrest before the rob beries occurred, why the robberies could not be pre vented, and why it was necessary to shoot everyone who was shot will be examined and compared as among all the alleged common course incidents. Plaintiffs will attempt to demonstrate that the things claimed to have been unintended have happened too often to be attributable to accident or mistake, and that perceived threats that could not have been real occur too often, for the officers' explanations of what happened and why to be credible.
 
 
 25
 Cunningham, 989 at 1260. The district court never conducted an individualized analysis to determine whether each moving defendant was entitled to qualified immunity based on his or her individual actions. Rather, the district court, after focusing on injuries caused by the shooting officers, concluded that:
 
 
 26
 It is settled law . . . that if a group of officers agree that if and when some of them knowingly commit unlawful acts others will falsify records and testify falsely to cover up the truth of the relevant events, all of those involved are liable for the unlawful acts. . . . Proof of plaintiffs' allegations that the SIS officers engage in a continuing course of unconstitutional conduct whereby some commit excessive force with complete impunity and others assist by covering up those unconstitutional acts would constitute proof of violation of clearly established law.
 
 
 27
 Id. at 1261-62. Apparently unaware of any evidence that the moving defendants participated in the alleged "course of conduct,"[18] the district court found it "necessary to go beyond the declarations submitted by the parties and consider how the officers may be impeached with testimony given on prior occasions and whether an inference might then be drawn that the alleged course of conduct might include the element of planned fabrication of documents and testimony." Id. Based on possible impeachment evidence and strategies of which only the court was aware, the district court found that a reasonable juror could find the existence of a "common course of conduct" based on the totality of the evidence, and, thus, denied the moving officers' motion for summary judgment. See id.
 
 
 28
 b. Denial of other City officials' motions for summary judgment
 
 
 29
 The district court denied all City officials' motions for summary judgment, with the exception of the City Mayor, finding that a jury could find that these defendants knowingly acquiesced in the use of excessive force by SIS officers. See Cunningham, 989 F.Supp. at 1276. To summarize, the district court reasoned that a reasonable jury could find that the City officials failed to take action to eliminate the officer "code of silence" after publication of the Christopher Commission Report,[19] and, thus, could be held liable under section 1983 for knowingly refusing to "terminate a series of acts by others" which led to Cunningham and Soly's constitutional injuries. See id. at 1267. The district court further found that a reasonable jury could find a causal connection between the City official's acquiescence in the "code of silence" and the use of force against Cunningham and Soly.
 
 B. The Smith Lawsuit
 
 30
 Based on the facts described above, Smith also filed a section 1983 action against the City, LAPD officers, police supervisors and commissioners, council members, and City attorneys. Based upon allegations identical to those contained in the Cunningham/Soly action, Smith argued that City official defendants either used excessive force, acquiesced in the use of excessive force, or engaged in an unlawful policy indemnifying officers against punitive damages in excessive force cases. On September 29, 1997, the district court consolidated the Smith case with the Cunningham/Soly lawsuits for discovery and pre-trial motions. Defendants in the Smith case moved for summary judgment based on qualified immunity. The district court denied the defendants' motions for reasons set forth in the earlier Cunningham decisions.
 
 III. Jurisdiction
 A. Collateral Order Exception
 
 31
 In general, we may review only final judgments of a district court on appeal. See Midland Asphalt Corp. v. United States, 489 U.S. 794, 798 (1989)(internal quotations omitted). Under the collateral order doctrine, however, we have jurisdiction to review a limited class of prejudgment orders. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949). The collateral order doctrine permits an appeal from a non-final judgment if three criteria are met: the "order must (1) conclusively determine the disputed questions, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." Midland, 489 U.S. at 799. The Supreme Court has emphasized that the conditions for collateral order appeal are to be stringently applied to ensure that this narrow exception "never be allowed to swallow the general rule " requiring a judgment to be final prior to appeal. Digital Equip. Corp. v. Desktop Direct Inc., 511 U.S. 863, 868 (1994). We therefore determine the applicability of the collateral order doctrine "without regard to the chance that the litigation at hand might be speeded, or a particular injustic[e] averted by a prompt appellate court decision." Id. (internal citation and quotation marks omitted).
 
 1. Qualified Immunity
 
 32
 We have jurisdiction to review a district court's order denying summary judgment on a qualified immunity defense under the collateral order doctrine. See Armendariz v. Penman, 75 F.3d 1311, 1316 (9th Cir. 1996). "However, our jurisdiction is limited to purely legal issues." Watkins v. City of Oakland, 145 F.3d 1087, 1091 (9th Cir. 1998).
 
 2. Heck v. Humphrey
 
 33
 We need not address whether the Heck issue meets the first and second prongs of the test outlined above because it is effectively reviewable on appeal. Appellate courts can effectively review a district court's ruling on a Heck issue because, unlike immunity rights where the right is lost if the case goes to trial, an appellate court can reverse the district court after entry of a final judgment without departing from the holding or purpose of Heck.
 
 3. Municipal Liability
 
 34
 The rule announced in Mitchell v. Forsyth, 472 U.S. 511 (1985), that individual defendants can appeal from the denial of a motion for summary judgment to obtain review of the merits of their qualified immunity defense does not empower a federal court to consider the denial of a municipality's motion for summary judgment in a section 1983 action. See Swint v. Chambers County Comm'n, 514 U.S. 35, 42-43 (1995).
 
 B. Pendent Appellate Jurisdiction
 
 35
 Arguing in the alternative, defendants contend that we have pendent appellate jurisdiction to review the district court's Heck ruling and its denial of summary judgment for the City. Pendent appellate jurisdiction refers to the exercise of jurisdiction over issues that ordinarily may not be reviewed on interlocutory appeal, but may be reviewed on interlocutory appeal if raised in conjunction with other issues properly before the court. In Swint, the Supreme Court set out a general rule against exercising pendent jurisdiction over related rulings but left open the possibility that appellate courts could extend such jurisdiction if the rulings were "inextricably intertwined" or if review of the pendent issue was necessary to ensure meaningful review of the independently reviewable issue. See id. at 44 n.2, 50-51 (following "review of the independently reviewable issue").
 
 
 36
 We have consistently interpreted "inextricably intertwined" very narrowly.[20] In California v. Campbell, 138 F.3d 772 (9th Cir. 1996), for instance, we stated that "[g]iven the Supreme Court's criticism of pendent appellate jurisdiction, the Court's `inextricably intertwined' exception should be narrowly construed." Id. at 778. "[M]ore is required than that separate issues rest on common facts." United States v. Oakland Cannabis Buyers' Coop., 190 F.3d 1109, 1113 (9th Cir. 1999). Two issues are not "inextricably intertwined" if we must apply different legal standards to each issue. Rather, the legal theories on which the issues advance must either (a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, see, e.g., Paige v. California, 102 F.3d 1035, 1040 (9th Cir. 1996), or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue, see, e.g., Marks v. Clarke, 102 F.3d 1012, 1018 (9th Cir. 1996).
 
 1. Heck v. Humphrey
 
 37
 The Heck issue is not "inextricably intertwined" with the qualified immunity issues properly before us on interlocutory appeal, nor is it necessary to decide the issue to ensure meaningful review of the defendants' qualified immunity claims. The issues properly before us on interlocutory appeal are analytically distinct from the Heck analysis. In order to decide the qualified immunity claims, we must determine 1) whether non-shooting officers are entitled to qualified immunity because "jamming" does not violate clearly established law, 2) whether council members are entitled to qualified immunity because a policy of indemnifying officers against punitive damages does not violate clearly established law, and 3) whether City attorneys are entitled to qualified immunity because recommending that council members indemnify officers against punitive damage awards does not violate clearly established law. These analyses do not implicate the validity of Cunningham's criminal conviction. Moreover, for reasons to be discussed, we lack jurisdiction to review the only two issues arguably intertwined with the Heck analysis: 1) whether the shooting officers used excessive force against Cunningham and Soly and 2) whether the commissioners and supervising officers failed to take adequate steps to prevent the alleged use of excessive force. Thus, we find that we lack jurisdiction to review the district court's denial of defendants' motion for summary judgment pursuant to Heck v. Humphrey.[21]
 
 2. Municipal Liability
 
 38
 The City argues that the district court erred in denying its motion for summary judgment because (1) the alleged violation is contingent upon a violation of a constitutional right and (2) plaintiffs have no cognizable constitutional claim. After examining whether the City's appeal is "inextricably intertwined" with any of rulings we have jurisdiction to review, we conclude that we lack jurisdiction to review the City's appeal.
 
 
 39
 a. Officers' appeal
 
 
 40
 Plaintiffs challenge the City's policy, custom and usage, is not "inextricably intertwined" with the SIS officers' qualified immunity claims. See Chew v. Gates, 27 F.3d 1432 (9th Cir. 1994) (holding that the liability of Los Angeles for a police dog bite was separate from the officer's qualified immunity defense). Whether the City's policy, customs, or usage caused plaintiffs' injuries is a separate inquiry from whether the non supervisory officers are entitled to qualified immunity. See id.
 
 
 41
 b. Policy-making defendants' appeals
 
 
 42
 In a recent decision, we held that a municipality's appeal in a section 1983 case was "inextricably intertwined" with a policy-making city attorney's appeal from a denial of summary judgment based on qualified immunity. See Huskey v. City of San Jose, 204 F.3d 893, 906 (9th Cir. 2000). Our Huskey decision relied on the plaintiff's failure to demonstrate that the city attorney's actions deprived him of his constitutional rights. See id. Because the plaintiff's failure to demonstrate actual injury necessarily resolved the city's appeal, we found the two appeals "inextricably intertwined " and exercised jurisdiction over the city's appeal. See id.
 
 
 43
 Unlike our Huskey opinion, our decision does not necessarily resolve the City's appeal by determining that plaintiffs did not demonstrate an actual injury. Cf. Marks, 102 F.3d at 1018. Rather, because the question of actual injury involves factual disputes outside of our scope of review, today's decision assumes plaintiffs may be able to convince a jury that they suffered constitutional injuries caused by some combination of police action and city official inaction. See V-1 Oil Co. v. Smith, 114 F.3d 854, 856 (9th Cir. 1997) (holding that court will exercise "jurisdiction over an interlocutory appeal that present[s] the question whether, assuming the disputed facts in favor of the nonmoving party, the moving party was entitled to qualified immunity"). Thus, we lack jurisdiction to review the City's appeal from the district court's denial of its summary judgment motion because this issue is not "inextricably intertwined" with any of the issues properly before us on interlocutory appeal.
 
 IV. Qualified Immunity
 A. Legal Landscape
 1. Jurisdiction
 
 44
 As noted above, we have jurisdiction to hear an interlocutory appeal from a denial of qualified immunity when the question involves a matter of law. See Mitchell , 472 U.S. at 528. However, where the district court denies immunity on the basis that material facts are in dispute, we generally lack jurisdiction to consider an interlocutory appeal. See Collins v. Jordan, 110 F.3d 1363, 1370 (9th Cir. 1997). More precisely, if the appellant argues that, contrary to the district court's opinion, an examination of the record reveals that a factual dispute does not exist, or that there is not sufficient evidence in the record to create such a factual dispute, we must dismiss for lack of jurisdiction. Id. Nevertheless, a denial of summary judgment on qualified immunity grounds is not always unappealable simply because a district judge has stated that there are material issues of fact in dispute. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996). An appellate court still has jurisdiction to consider defendants' assertion that the dispute of fact is not material. See Collins, 110 F.3d at 1370. This is different from a claim that the court's findings are not supported by the record, as a claim of materiality is solely one of law, and therefore is reviewable on an interlocutory basis. The claim of lack of materiality is solely one of law, and therefore is reviewable on an interlocutory basis. Id.
 
 2. Analytical Framework
 
 45
 In Harlow v. Fitzgerald, the Supreme Court set forth the applicable legal standard for qualified immunity:"government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). Five years later, in Anderson v. Creighton, 483 U.S. 635 (1987), the Court clarified the objective test it set forth in Harlow, explaining that a district court must decide whether a reasonable public official would know that his or her specific conduct violated clearly established rights. Id. at 636-37. In Anderson, the plaintiff sued an FBI agent for damages based on the warrantless search of his house. The district court granted summary judgment to the agent on the ground that the search was lawful, holding that the undisputed facts revealed that the agent had probable cause to search the plaintiff's home and that any failure to obtain a warrant was justified by the presence of exigent circumstances. The Eighth Circuit reversed, holding that the FBI agent was not entitled to summary judgment on qualified immunity grounds, because the right he was alleged to have violated--the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances--was clearly established. See id. at 637-38.
 
 
 46
 The Supreme Court reversed, framing the issue as follows:
 
 
 47
 The Court of Appeals specifically refused to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances. . . . It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials--like other officials who act in ways they reasonably believe to be lawful--should not be held personally liable. The same is true of their conclusions regard ing exigent circumstances.
 
 
 48
 Id. at 640-41 (citation omitted) (emphasis added).
 
 
 49
 Having focused its analysis not on the alleged violation of the right, but on whether a reasonable public official would know that his or her specific conduct violated clearly established rights, the Court held that a "law enforcement officer who participates in a search that violates the Fourth Amendment may [not] be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment." Id. at 636-37.
 
 
 50
 At least one of our sister circuits has taken heed of the narrower focus required by Anderson and required "a court faced with whether a claim of qualified immunity properly was denied to engage in an analysis of the facts adduced concerning the conduct of the official who claims immunity." Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996). We agree with this approach. In short, in resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in a light most favorable to the plaintiff). See V-1 Oil, 114 F.3d at 856. Although the district court correctly recited the legal principles governing its resolution of the qualified immunity issue as established in Harlow and Anderson, its analysis fell far short of the fact intensive inquiry those cases require. Our analysis corrects this error and examines each defendant's claim of qualified immunity on the basis of undisputed facts concerning the relevant specific conduct.
 
 
 51
 In establishing this methodological inquiry and applying it to the case before us, we are mindful of our responsibility to determine the appropriate level of generality at which to analyze the right at issue: we must not allow an overly generalized or excessively specific construction of the right to guide our analysis. The Supreme Court has admonished that the right alleged to have been violated must not be so broadly defined as to "convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson, 483 U.S. at 639. On the other hand, we have also cautioned that the right can not be so narrowly construed so as to "define away all potential claims." Kelley v. Borg, 60 F.3d 664, 667 (9th Cir. 1995).
 
 
 52
 The danger, of course, in analyzing a scheme through its component parts is that this compartmentalization could potentially accomplish what Kelley prohibits via an alternative route: by too narrowly focusing on, or delineating, the constituent elements of an overall scheme, the universe of rights impacted by the specific compartmentalized action can be substantially constricted or narrowed.[22] Here, however, we are not faced with such a situation. The police officers do not attempt to deconstruct the alleged scheme into unreasonably narrow or limited component parts in such a manner as to "define away all potential claims." Rather, the actions we analyze below are naturally and logically differentiated, and they potentially impact on well-established rights under which a plaintiff may reasonably have a valid claim.
 
 B. Shooting Officers
 
 53
 Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. See Graham v. Connor, 490 U.S. 386, 397 (1989). Determining whether force used in making an arrest is excessive or reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. We have recently reiterated that the test for qualified immunity in excessive force cases is the same as the test on the merits. See Katz v. United States , 194 F.3d 962, 968 (9th Cir. 1999).
 
 1. Cunningham/Soly
 
 54
 Plaintiffs allege that the SIS used excessive force against them when the officers fired repeated shotgun blasts into plaintiffs' car after the officers failed to announce that they were police. The district court found a disputed fact issue concerning "what was going on in the officers' minds--what they saw, and what they thought." Cunningham , 989 F.Supp. at 1260. Because the district court found material factual disputes, i.e., whether the officers had probable cause to use deadly force against Cunningham and Soly, we lack jurisdiction to review whether the shooting officers are entitled to qualified immunity. See Collins, 110 F.3d at 1370. Thus, for purposes of this opinion, we must assume that the plaintiffs can prove that they suffered a constitutional injury.
 
 2. Smith
 
 55
 Although the district court did not specifically identify material issues of fact regarding the shooting of Smith, such disputes are easily gleaned from the record. Defendants argue that the SIS officers who shot Smith reasonably mistook him for the fleeing suspect who they knew to be armed. Defendants also argue that they shot only after Smith moved his hand towards his waistband as if reaching for a gun. Smith claims that he made no threatening movements. Given this factual dispute, the shooting officers are not entitled to qualified immunity. A reasonable juror could find that Smith suffered a constitutional injury when the officers mistook him for a fleeing felon and shot him without reason to believe that he was reaching for his gun.
 
 C. Non-Shooting Officers
 
 56
 As previously mentioned, the district court failed to analyze the acts of each individual defendant in its qualified immunity analysis. Rather, in denying the non-shooting officers' motion for summary judgment, the district court made the following general remarks:
 
 
 57
 It is settled law . . . that if a group of officers agree that if and when some of them knowingly commit unlawful acts others will falsify records and testify falsely to cover up the truth of the relevant events, all those involved are liable for the unlawful acts. An official is liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonable should [have] know[n], would cause others to inflict constitutional injury. . . . Proof of plaintiffs' allegations that the SIS officers engage in a continuing course of unconstitutional conduct whereby some commit excessive force with complete impunity and others assist by covering up those unconstitutional acts would constitute proof of violation of clearly established law.
 
 
 58
 Cunningham, 989 F.Supp. at 1261 (internal citations omitted). This statement falls far short of the individualized analysis we require for resolving motions for summary judgment based on qualified immunity. In the following sections, we conduct the individualized analysis that the district court failed to perform, examining each of the following elements of the alleged "common course" of unlawful conduct: 1) failure to arrest, 2) failure to intercede, 3) use of the "jamming technique," 4) perjury and conspiracy to commit perjury, and 5) fabricating evidence.
 
 1. Failure to Arrest
 
 59
 Plaintiffs first argue that the defendants violated their constitutional rights because they could have arrested the criminal suspects before the armed robberies occurred, and, thus, avoided the need to use deadly force. Plaintiffs' argument lacks merit.
 
 
 60
 There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.
 
 
 61
 Hoffa v. United States, 385 U.S. 293, 310 (1966). Plaintiffs' allegations that the SIS officers deliberately allowed Cunningham and Soly to commit their crimes, despite having probable cause to arrest them, does not state a violation of a constitutional right.
 
 2. Failure to Intercede
 
 62
 Defendants concede that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds,518 U.S. 81 (1996). Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede. See Bruner v. Dunaway, 684 F.2d 422, 42627 (6th Cir. 1982) (holding that officers who were not present at the time of the alleged assault could not be held liable in a section 1983 action); Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (granting arresting officers' motion for summary judgment because the officers had no "realistic opportunity" to prevent an attack committed by another officer). In this case, officers who were not present at the time of the shootings could not intercede to prevent their fellow officers from shooting at Cunningham, Soly and Smith. Moreover, the undisputed evidence shows that the non-shooting officers who were present at the shootouts had no "realistic opportunity" to intercede. Thus, we find that the non-shooting and non-present officers cannot be held liable for failing to intercede to prevent the shooting of the plaintiffs in the instant case.
 
 
 63
 3. "Jamming"
 
 
 64
 A police officer's right to make an arrest necessarily includes the right to use some degree of force. See Graham v. Connor, 490 U.S. 386, 396 (1989). In Mendoza v. Block, 27 F.3d 1357 (9th Cir. 1994), we held that novel police practices that have not been tested in the courts may still violate clearly established law if the force involved in the practice "violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure." Id. at 1362 (quoting White v. Pierce County, 797 F.2d 812, 816 (9th Cir. 1986)). In these situations, "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." Id.
 
 
 65
 In Chew v. Gates, 27 F.3d 1432 (9th Cir. 1994), we further explained the qualified immunity analysis when faced with a novel police practice:
 
 
 66
 [W]e do not mean to suggest that all actions taken pursuant to a longstanding policy are necessarily immunized. An officer who unlawfully implements an official policy or ordinance in an egregious manner or in a manner which clearly exceeds the reason able bounds of the policy is not entitled to qualified immunity, whether or not there is a case on point declaring such actions unconstitutional. In other words, even in the absence of relevant case law, if the manner of implementation of an otherwise con stitutional policy is not only unconstitutional, but patently so, the officer will be deemed to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Moreover, the existence of an unofficial or unacknowledged policy or practice is not sufficient to immunize an officer from liability.
 
 
 67
 Id. at 1450 (internal citation omitted).
 
 
 68
 Plaintiffs allege that all officers participated in a "course of conduct" which included the use of "jamming" suspects into confined spaces in an effort to provoke the use of force. Whether the defendants are entitled to qualified immunity for their actions in formulating or implementing the "jamming" policy "turns on the objective legal reasonableness of the action . . . assessed in light of legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal cites and quotation marks omitted). For reasons to be discussed, we find that a reasonable law enforcement officer might well have failed to recognize that authorizing or implementing the "jamming" technique would lead to a violation of the plaintiffs' constitutional rights.
 
 
 69
 According to the undisputed evidence, the use of the "jamming" technique constituted neither a new nor unique policy when the Cunningham and Soly shootings occurred. Additionally, the uncontroverted evidence indicates that the "jamming" technique had been used hundreds of times without incident, and the plaintiffs do not present any evidence that the technique was used against them in a different and unreasonable manner relative to the past incidences of "jamming" the defendants submitted as evidence.
 
 
 70
 Moreover, given the circumstances surrounding its use, the jamming technique was a reasonable use of force for the purposes of the Fourth Amendment. "The `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Graham, 490 U.S. at 396; see also Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994) (quotation and citation omitted) (holding that the "reasonableness of force is analyzed in light of such factors as the requirements for the officer's safety, the motivation for the arrest, and the extent of the injury inflicted"). Here, the officers were confronted with armed individuals in the midst of committing a dangerous felony.[23] Accordingly, we hold that it was not clearly established at the time of the shootings that the "jamming" technique was an unreasonable use of force.[24]
 
 
 71
 We also find that the use of the "jamming" technique was too attenuated from the use of deadly force against Smith to support his action against the officers who participated in that operation. The shooting of Smith did not occur until after several events occurred: 1) officers jammed the suspects' vehicle (a practice which we have already found not prohibited by clearly established law), 2) the armed suspect fled the police, 3) police searched for the armed suspect for an extended period of time, and 4) Smith decided to run from the police while screaming, "They're coming for us! " Given these facts, we find that the "jamming" incident is too attenuated from the alleged use of excessive force against Smith, and, thus, is immaterial to the question of whether he suffered an injury of constitutional proportion.
 
 4. Perjury and Conspiracy to Commit Perjury
 
 72
 Even assuming plaintiffs had evidence of individual defendants perjury or conspiracy to commit perjury, we find that the non-shooting officers are entitled to immunity from suit. First, as witnesses, these defendants are "absolutely immune from damages liability based on their testimony." Briscoe v. LaHue, 460 U.S. 325, 326 (1983). Second, these defendants are similarly entitled to absolute immunity from damages liability for any alleged conspiracy to commit perjury. See Franklin v. Terr, 201 F.3d 1098, 1102 (9th Cir. 1999) (holding that "the rule of Briscoe applies to allegations of conspiracy to commit perjury by someone who has testified as a witness in the proceeding where the perjury took place"). Obviously, testimonial immunity does not encompass non testimonial acts such as fabricating evidence.
 
 5. Fabricating Evidence
 
 73
 Plaintiffs allege that all of the non-shooting officers participated in a "course of conduct" which included fabricating evidence to support their fictitious version of events in excessive force cases. The plaintiffs offer not an iota of evidence that the non-participating officers in this case ever fabricated evidence. Rather, plaintiffs rely on conclusory allegations and a report published by the Christopher Commission several years before the events giving rise to the instant actions, which says nothing about the individual conduct of any of the officers involved in the action. Given the complete lack of evidence suggesting any of the defendant officers fabricated evidence, we find that none of the defendant officers can be held liable for their alleged involvement in fabricating evidence.
 
 D. Supervisors and Commissioners
 
 74
 The district court found material fact disputes concerning whether police supervisors and commissioners were liable for actions taken as supervisors. See Cunningham , 989 F.Supp. at 1268. Supervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others. See Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991). In this case, the district court found the following:
 
 
 75
 [O]n the basis of the Christopher Commission Report and of both positive evidence and lack of contrary evidence that there has been no change, that the officer code of silence and the preference for believing officer versions of excessive force incidents over other more credible evidence have existed continuously from the date of release of the Christopher Commission Report. A jury could also find that if excessive force was used by the SIS officers in this case, there is a causal connection between these poli cies and the use of force against [the plaintiffs].
 
 
 76
 Cunningham, 989 F.Supp. at 1268. Although the evidence seems to clearly suggest that the commissioners took numerous steps to implement the recommendations of the Christopher Commission, and although evidence of supervisor misconduct seems virtually nonexistent, because the district court found material factual disputes, we lack jurisdiction to review the district court's denial of qualified immunity for police supervisors and commissioners. See Collins, 110 F.3d at 1370.
 
 
 77
 Notwithstanding our inability to review the district court's finding of factual disputes, we reverse the denial of summary judgment as to Captain Daniel Koenig in the Cunningham/ Soly action. The undisputed evidence clearly shows that Captain Koenig did not assume a supervisory position over the SIS until nearly one month after the Cunningham/Soly shootout. Captain Koenig cannot incur supervisory liability for conduct that occurred before he became an SIS supervisor.
 
 E. City Council Members
 
 78
 Plaintiffs allege that the council members effectively promoted and ratified the use of excessive force by SIS officers by voting to indemnify SIS officers against punitive damage awards in excessive force cases. For reasons discussed below, we reject the plaintiffs' argument and reverse the district court's denial of qualified immunity for the council members.
 
 
 79
 In Trevino v. Gates, 99 F.3d 911 (9th Cir. 1996), we examined whether council members could be liable under section 1983 for voting to indemnify LAPD officers against punitive damage awards in excessive force cases like those presently before us. We held that the council members were entitled to qualified immunity because the law was not clearly established that a policy of indemnifying punitive damage awards violates constitutional rights. See id. at 918. We observed that:
 
 
 80
 A city council does not violate section 1983 if it indemnifies officers against punitive damage awards on a discretionary, case by case basis, and complies in good faith with the requirements of Cal. Gov. Code S 825(b).
 
 
 81
 Id. Plaintiffs contend that since Trevino the law has been clearly established that a policy of indemnifying punitive damage awards violates constitutional rights.
 
 
 82
 The Cunningham/Soly incident occurred nearly one year before we decided Trevino. As a matter of chronological necessity, it was not clearly established before or at the time of the Cunningham/Soly incident that voting to indemnify officers against punitive damage awards could violate constitutional rights. Thus, even assuming that these decisions somehow promoted the alleged use of excessive force in the Cunningham/Soly incident, the council members are clearly entitled to qualified immunity for lawsuits based on preTrevino decisions to indemnify officers against punitive dam-age awards.
 
 
 83
 The Smith incident occurred approximately four months after we decided Trevino. In order to defeat the council members' motion for summary judgment in the Smith case, Smith must present some evidence that the council members did not implement section 825's indemnification procedure in good faith in the four month window between the Trevino decision and the Smith incident. Smith failed to meet this burden.
 
 
 84
 The council members submitted evidence indicating that they followed Trevino's instruction by evaluating officers' indemnification claims in good faith and on a case-by-case basis. Specifically, the council members point to the following evidence:
 
 
 85
 In Guerra v. City of Los Angeles, the council members deliberated for three days before deciding to indemnify an officer against a punitive damage award in an excessive force case. The council members repeatedly deferred voting until they received additional information and had a chance to confer with their attorney.
 
 
 86
 In Clark v. City of Los Angeles, the council members again held multiple sessions before deciding to indemnify an LAPD officer in an excessive force case.
 
 
 87
 In Tave v. Gates, the council members actually refused to indemnify an LAPD officer against a punitive damage award, despite the recommendation of the City Attorney that they do so.
 
 
 88
 The council members' evidence suggests that they implemented section 825's indemnification procedure in good faith in accordance with Trevino. Indeed, rather than following a policy of rubber-stamping City Attorney recommendations, the undisputed evidence shows that the council members considered each claim on a case-by-case basis. Smith's conclusory allegations cannot withstand the council members' motion for summary judgment. Thus, we reverse the district court's denial of summary judgment.
 
 F. City Attorneys
 
 89
 City attorneys cannot be held liable for their participation in the indemnification process unless it was clearly established that an indemnification policy would be unconstitutional. Based on our decision granting summary judgment to the council members in both the Cunningham/ Soly and Smith actions, we find that the district court erred when it denied the City attorneys' motion for summary judgment. Because it was not clearly established that City attorneys could be held liable to future plaintiffs based on their indemnification recommendations in excessive force cases, we hold that the City attorneys are entitled to qualified immunity from suit.
 
 V. Injunctive Relief
 
 90
 We find that the plaintiffs lack standing to challenge the policies and practices they seek to enjoin. See Los Angeles v. Lyons, 461 U.S. 95 (1983).
 
 VI. Conclusion
 
 91
 For the aforementioned reasons, we affirm the district court's denial of summary judgment to the shooting officers, the police commissioners, and the supervising officers (with the exception of Captain Daniel Koenig in the Cunningham/ Soly action). Otherwise, we reverse the district court's denial of summary judgment to the non-shooting officers, the council members, the City attorneys, and Captain Daniel Koenig in the Cunningham/Soly action. Each party to bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Frank Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.
 
 
 [2]
 Decedent Daniel Soly's parents, Armand and Betty Soly, bring this action in their individual capacities and on behalf of their deceased son who was killed in a shootout with LAPD officers following the armed robbery of the Southwest Liquor and Deli.
 
 
 [3]
 On September 29, 1997, the district court consolidated the cases involved in the instant appeal for discovery and pre-trial motions.
 
 
 [4]
 In Heck v. Humphrey, the Supreme Court held that in order to recover damages for harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a section 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. 512 U.S. 477 (1994)
 
 
 [5]
 The Honorable J. Spencer Letts, United States District Judge for the Central District of California. During the pendency of this appeal, Judge Letts recused himself from the cases involved in the instant appeal. See Cunningham v. Gates, 45 F.Supp.2d 783 (C.D. Cal. 1999). Since that time, the cases have been assigned to a different judge, and, thus, defendants' motion to remove Judge Letts is moot.
 
 
 [6]
 We do not discuss motions outside the scope of this appeal. Thus, although the district court dismissed several defendants from this action prior to ruling on the summary judgment motions involved in this appeal, we find it unnecessary to discuss these aspects of an otherwise long and complicated procedural history.
 
 
 [7]
 "Jamming" refers to the practice of boxing in a suspect's vehicle with police cars. This practice is generally used by plain-clothed special units, such as narcotics and the SIS. "Jamming" involves the simultaneous and coordinated approach of an armed suspect by unmarked police vehicles, thus giving the officers the tactical advantage of surprise. According to the defendants, this technique prevents suspects from fleeing and potentially endangering the lives of bystanders in a high speed chase through the streets. According to the undisputed affidavit of Captain Daniel Koenig, the LAPD has no practice or policy for the SIS or any other unit to automatically or always use the "jamming technique. " Rather, according to Captain Koenig, the officer-in-charge at the scene decides whether and when to use "jamming" based on the exigencies of each tactical situation.
 
 
 [8]
 Although they share a common last name, Michael Smith and plaintiff Grover Smith are not related in any way.
 
 
 [9]
 In relevant part, section 1983 reads:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. S 1983.
 
 
 [10]
 The following officers exchanged gunfire with Cunningham during the shootout following the armed robbery of the liquor store: David Wixon, Larry Winston, James Harris, and Edward Guiza. Brian Davis, who was actually at the scene of the gunfight, testified that he did not shoot at Cunningham or Soly. Of all the shooting officers, only Davis moved for summary judgment based on qualified immunity.
 
 
 [11]
 The following eight officers participated in the surveillance of Cun-ningham and Soly but were not at the scene of the shootout and did not actually fire their weapons at either Cunningham or Soly: Joseph Freia, John Tortorici, Richard Zierenberg, Gary Zerbey, Richard Spelman, James Tippings, John Helms, and Jerry Brooks.
 
 
 [12]
 The following defendants held supervisory roles over the SIS at the time of the Cunningham/Soly shootout: former Chief Willie Williams, Deputy Chief John D. White, and Captain Robert Rochhoft. Plaintiffs also named Captain Daniel Koenig, who replaced Rochhoft after the Cunningham/Soly shootout in July 1995, and Captains Gregory Berg and John Trundle, who preceded Rochhoft.
 
 
 [13]
 The district court granted Mayor Richard Riordan's motion for summary judgment based on qualified immunity, reasoning that, as a matter of law, "the power to appoint people who can change undesirable practices is not equal to the power to change those practices directly, and that only people who have the direct power to change those policies can be held liable." Cunningham, 989 F.Supp. at 1275-76. Although we express no opinion on the district court's reasoning, we agree that the Mayor was clearly entitled to qualified immunity.
 
 
 [14]
 On December 17, 1996, a state jury convicted Cunningham of 1) three counts of attempting to murder SIS officers by firing a weapon at them, 2) Soly's murder by provoking the officers into shooting at the suspects' car, 3) robbery, and 4) burglary. The jury also found "special circumstances" regarding Cunningham's conviction for killing Soly that would support imposition of the death penalty under California Penal Code S 190.2(a)(17). The jury necessarily determined that Cunningham did not act in self-defense.
 
 
 [15]
 The following seven defendant officers were not present at the time of the shootings: Joseph Freia, John Tortorici, Richard Zierenberg, Gary Zerbey, Richard Spelman, James Tippings, John Helms, and Jerry Brooks.
 
 
 [16]
 Under Cal. Gov. Code Section 825(b), a public entity, "acting in its sole discretion," may pay punitive damages awarded against a public employee if: (i) the employee was acting within the course and scope of employment during the incident in question; (ii) the employee acted "in good faith, without actual malice and in the apparent best interests of the public entity"; and (iii) payment of the punitive damages "would be in the best interest of the public entity."
 
 
 [17]
 Under the City Charter, the Board of Police Commissioners is the head of the LAPD. The Board sets overall policy while the Chief of Police manages daily operations and implements the Board's policy direction and goals.
 
 
 [18]
 In a revealing footnote, the district court virtually conceded the complete lack of evidence underlying plaintiffs' case:
 Obviously, however, in a circumstance in which plaintiffs' chance of success will depend almost entirely on their ability to impeach the officers by showing that their testimony is untrue, plaintiffs cannot disclose how they intend to do this with too much specificity. The court is also constrained from doing so both for fear of disclosing too much of plaintiffs' case, and for fear of helping plaintiffs make their case. Suffice it to say here that in deciding the SIS officer motions, the court determined that, notwithstanding the lack of positive evidence to support the plaintiffs' claims, there would be enough impeachment evidence for the case to go to the jury.
 Cunningham, 989 F.Supp. at 1266 n.7(emphasis added).
 
 
 [19]
 The Christopher Commission Report (Report) was released in 1991 following the much publicized beating of Rodney King. The Report, published approximately four years before the events giving rise to this lawsuit, identified a number of official policies and practices that contributed to the problem of the use of excessive force by LAPD officers. Specifically, the Report uses the term "officer code of silence" and describes it as follows: "[I]t consists of one simple rule, an officer does not provide adverse information against a fellow officer." The Report makes clear that the existence of the "code of silence" was well-known to high-ranking LAP officials even before the Report was released. The Report describes the "code of silence" as "[p]erhaps the greatest single barrier to the effective investigation and adjudication of complaints " of excessive force. Report of the Independent Commission on the Los Angeles Police Department 168 (1991) (the Christopher Commission Report).
 
 
 [20]
 Unlike the D.C. Circuit, we have consistently given Swint a very narrow reading. Compare Rendall-Speranza v. Nassim , 107 F.3d 913, 917 (D.C. Cir. 1997) (allowing pendent review if such review will terminate the entire case, sparing both the appellate and district courts from further proceedings and giving the parties a speedy resolution), with Paige v. California, 102 F.3d 1035, 1039 (9th Cir. 1996) (rejecting judicial economy as a basis for pendent review).
 
 
 [21]
 Although we lack jurisdiction to review the district court's denial of summary judgment based on Heck v. Humphrey, we feel compelled to express our serious disagreement with the district court's ruling. It seems quite clear that Cunningham's section 1983 action would be barred under Heck and its progeny. In Cunningham's criminal trial, a jury rejected virtually every issue raised in Cunningham's section 1983 action. Moreover, it seems quite likely that Soly's action would also be Heck-barred based on California's common law of privity. Under governing Ninth Circuit precedent, a district court has discretion to depart from the law of the case established by prior rulings if the first decision was clearly erroneous or a manifest injustice would otherwise result. See United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998). Thus, for reasons outlined above, we encourage the parties in this case and the judge who replaced Judge Letts to revisit this issue.
 
 
 [22]
 Indeed, many cases of qualified immunity are not even susceptible to the analysis we conduct here as they involve either a solitary act or a course of conduct that is not reasonably divisible.
 
 
 [23]
 By no means are we endorsing any police tactic that needlessly or unreasonably creates a dangerous situation necessitating an escalation in the use of force. The police officers, as we noted, were not required to make an arrest at any given point during the commission of the crime. See Hoffa, 385 U.S. at 310. Therefore, their decision to arrest the individuals after the crime had been committed cannot be said to have unreasonably created a dangerous situation.
 
 
 [24]
 We do not mean to suggest the use of the "jamming" technique is a per se reasonable use of force to effectuate arrest. Rather, because plaintiffs fail to respond to the defendants' evidence regarding the well established use of the jamming technique and offer no evidence indicating that the technique was employed against them in a manner different from its past usage, we find that the defendants are entitled to qualified immunity from suit in this case.